

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-6-1997

# Konstantopoulos v. Westvaco Corp

Precedential or Non-Precedential:

Docket 94-7462

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Konstantopoulos v. Westvaco Corp" (1997). *1997 Decisions*. Paper 96.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/96

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 6, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 94-7462

SHERLYN KONSTANTOPOULOS and
DIMOS KONSTANTOPOULOS,
Appellants

v.

WESTVACO CORPORATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civil No. 90-00146)

Argued: January 10, 1996

Before: SCIRICA, ALITO and WEIS, Circuit Judges

(Opinion Filed: May 6, 1997)

Diana S. Donaldson (Argued)
Schnader, Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Counsel for Appellants

Donald E. Reid (Argued)
Andrea L. Rocanelli
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Post Office Box 1347
Wilmington, DE 19899

Counsel for Appellee

**OPINION OF THE COURT**

ALITO, Circuit Judge:

Sherlyn Konstantopoulos, a former employee of Westvaco Corporation, and her husband, Dimos Konstantopoulos, brought this action against Westvaco, asserting claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as claims under Delaware law. The district court held that the state-law claims were barred by the state Workmen's Compensation Act, and after a bench trial on the Title VII claims, the court awarded some, but not all, of the relief that the plaintiffs sought. The plaintiffs then took this appeal, but we affirm.

I.

A. The following facts are either undisputed or were properly found by the district court. Sherlyn Konstantopoulos (hereinafter "Konstantopoulos") began work at Westvaco in September 1987. 6/30/94 Dist. Op. at 3. After initially working as a "helper" in the "Finishing Department," she was promoted in April 1989 to the position of "helper" in the "Web" Department. Id. at 3-4. The Web Department contained a single printing press that used large rolls of paper spliced together to create one continuous "web" of paper. Id. at 4. Workers in the Web Department were divided into four "tours," and Konstantopoulos was initially assigned to "D" tour under the supervision of foreman Ron Hurley. Id. at 4-5. Mike Marshall and Ed Peterman were also assigned to this tour. Id. at 5-6. At the time, Konstantopoulos was the only woman working in the Web Department, and she was given little training. Id. at 6. The district court found that Westvaco "did not in any way prepare its employees - male and female - to work in an environment where men were working for the first time with women and where women were working for the first time with machinery." Id. at 32.

During her time with this tour, "Ed Peterman, rather than provide substantial assistance to [Konstantopoulos] on

2

[certain] assignments . . . , gave nonresponsive, sarcastic answers to [Konstantopoulos's] questions `quite a few times.' " For instance, Konstantopoulos testified that on one occasion when she asked for Peterman's help with a lid on a drum, he responded: "Aren't you liberated?" Id. at 8. Another time, when Konstantopoulos informed Peterman that there was a malfunction on a particular machine, Peterman told her to fix the machine herself even though she had not been trained to do so. Id. Peterman also threatened on many occasions to send Konstantopoulos back to the Finishing Department if she could not perform in the Web Department. Id. Konstantopoulos's evaluations in late May reflected "below average ratings in several categories of work, including knowledge, quantity and quality of work, and judgment and common sense." Id. at 9.

During Konstantopoulos's assignment to "D" tour, Mike Marshall engaged on several occasions in sexually suggestive behavior directed toward her. 6/30/94 Dist. Ct. Op. at 7, 10-11. For instance, one day in April when she was working about 25 feet away from Marshall, with whom she had had no prior contact, "Marshall yelled: `Sherri, look at this.' [Konstantopoulos] looked up, `saw white' and Marshall's `pants' flaps open'; [Konstantopoulos] turned her head immediately and covered her eyes. [Konstantopoulos] continued working and did not discuss this experience with anyone." Id. at 7. Konstantopoulos testified that in June 1989 Marshall made other similarly suggestive gestures or remarks on three occasions. See id. at 11.

After these incidents, Konstantopoulos met with Frank Alcamo, the plant manager, and told him about some of the things that Marshall and Peterman had done. See 6/30/94 Dist. Ct. Op. at 11. Konstantopoulos then met twice with other Westvaco management representatives on June 21, 1989. See id. The first meeting was attended by the personnel manager and the supervisor of the Web Department, as well as the union president. See id. at 11-12. Konstantopoulos reiterated the information that she had given to Alcamo and also complained that her foreman, Ron Hurley, was not training her. Id. Westvaco management then met with Marshall and Peterman, who

3

denied the charges. See id. at 12. "Westvaco's `EEOC policy' was read to both Marshall and Peterman, along with the admonition that `increasingly severe disciplinary measures' would be taken if any further sexual harassment complaints were made against either of them." Id. Later the same day, Konstantopoulos met again with Westvaco management and agreed to be transferred to a new tour commencing the next day, June 22, 1989. See id. at 12-13.

The foreman of Konstantopoulos's new tour was Larry Cahall, who "was not informed of the circumstances underlying [Konstantopoulos's] transfer." 6/30/94 Dist. Ct. Op. at 3. Konstantopoulos experienced harassment during this tour as well. See id. at 14-16. One day in July 1989, she found a note that said: "Sherry doesn't need help, she needs a babysitter." Id. at 14. On approximately July 19, her locker (and three others) were damaged, and shortly thereafter she found trash in her locker. Id. at 14. On July 21, she filed a complaint with the Equal Employment Opportunity Commission, charging that her locker had been damaged in retaliation for her complaints against Marshall and Peterman. See id. at 20. On July 24, she reported to Cahall that her locker had been damaged. Id. at 14. Cahall then advised his supervisor, who issued a warning that anyone found guilty of vandalism would be disciplined. Id.

In August, someone wrote a sexually insulting remark concerning Konstantopoulos on a clipboard that was kept near a machine in the Web Department. See 6/30/94 Dist. Ct. Op. at 14-15. Konstantopoulos reported this incident to Cahall, who said that it would be difficult to identify the perpetrator and suggested that Konstantopoulos erase the writing or throw the clipboard away. Id. at 15.

According to Konstantopoulos, during the period from July 23 to August 28, 1989, a co-worker, Greg Games, made several sexually insulting or threatening remarks to her. See 6/30/94 Dist. Ct. Op. at 15. On one occasion, she said, he grabbed her by the neck and said that he would like to kill her. Id.

"[Konstantopoulos] did not report any of these incidents to anyone at Westvaco at the time they occurred." Id. at 15.

4

"[She] testified, however, that she was `upset,' `afraid,' `hurt,' `humiliated,' and `diminished' by the various incidents." Id. at 15-16. At the end of every tour, Konstantopoulos was evaluated by foreman Cahall, and these evaluations were frequently below average or unsatisfactory. See id. at 16.

On September 2, 1989, Konstantopoulos gave Cahall a note from her doctor, Costas A. Terris, advising that she should be assigned to a "light duty job" for three to four weeks due to "job and home-related stress." 6/30/94 Dist. Ct. Op. at 16. Westvaco asked Konstantopoulos for additional information concerning the type of light-duty work that she could perform, but she instead supplied a second note from Dr. Terris, dated September 14, 1989, which stated that she had been under his care since August 21, 1989, for the treatment of "severe work induced stress"; that "[t]here appear[ed] to be some improvement"; but that she should "remain off work for another 3-4 weeks." Id. at 16-17. On September 11, 1989, Konstantopoulos supplemented her prior EEOC complaint by reporting, among other things, that a "derogatory sexual remark" had been written about her on a clipboard and that foreman Cahall had not taken any action in response. Id. at 20. She stated that she had suffere d"anxiety and stress resulting in los[t] time from work and extensive medical bills." Id.

Konstantopoulos remained out of work until October 30, 1989, when she "returned to work, able and willing." Id. at 17. However, she elected to take a layoff, and she did not return to work thereafter until she was recalled on April 16, 1990. Id. On December 21, 1989, while Konstantopolous was laid off, the EEOC issued two right-to-sue letters, and on March 27, 1990, she commenced this action byfiling a complaint against Westvaco. See id. at 21. Her complaint asserted Title VII claims for sexual harassment and retaliation, as well as a state-law claim for tortious infliction of emotional distress.

When Konstantopoulos returned to work on April 16, 1990, she was again assigned to the Web Department, with Ron Hurley as her foreman. 6/30/94 Dist. Ct. Op. at 17. During her first tour, she broke a piece of machinery and

5

was publicly chastised by Hurley. Id. at 17. During her next tour (April 23 and 24), she was temporarily transferred to the Finishing Department because there was not sufficient work in the Web Department. Id. at 18. None of her co-workers harassed her during this two-day period. Id.

On April 25, Konstantopoulos was assigned as a helper in the Web Department on Larry Cahall's tour. 6/30/94 Dist. Ct. Op. at 18. Konstantopoulos informed Cahall of her apprehension about the assignment, but Cahall was required by the collective bargaining agreement to transfer her to the Web Department "because she was the person in the Finishing Department with the most seniority who had worked in the Web Department previously." Id. Cahall, however, assured Konstantopoulos that he would be available in his office if she needed him, and he also warned the crew that he would not tolerate any harassment of her. Id. In addition, Cahall made frequent visits to the Web Department that day, "entering through a different door each time, and he spent more time than he normally would in the area." Id.

Konstantopoulos made no complaints to Cahall that day, but she testified at trial concerning two incidents involving co-workers. See id. at 18-19. She stated that Mike Marshall and Ed Peterman "squinted their eyes . . . and shook their fist[s]" at her and that another co-worker threw away her lunch. Id. The district court stated that it was not clear from the record whether Konstantopoulos's name was on her lunch bag and that the co-worker who threw away the bag stated that he had done so accidentally. See id. at 19.

After completing her shift on April 25, Konstantopoulos left without speaking to anyone from Westvaco. Id. at 19. The next day, she gave Cahall the following note:

To whom in may concern:

Ms. Konstantopoulos has been under my care for the past several months for the treatment of severe work related anxiety. She has now been referred to a local psychiatrist to continue therapy and has also been advised to stay off work for an additional 6-8 weeks.

Sincerely,

Costas A. Terris, M.D.

6

Id. Cahall told Konstantopoulos to go home and to call the personnel manager the next day, and Konstantopoulos responded: "Am I fired now?" Id. at 20. She never returned to work at Westvaco. At the time of trial, she had not worked anywhere else and had not looked for work. Id. at 20.

B. As eventually amended, the complaint in this case contained six counts. Count I alleged that Westvaco had violated § 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), by "creating a hostile and intimidating work environment." App. at 33. Count II claimed that Westvaco had violated § 703(a) by engaging in various retaliatory actions against Konstantopolous as a result of the initial charge of sexual harassment that she filed with the EEOC in July 1989. Count III asserted a claim under Delaware law for intentional infliction of emotional distress, and Count V asserted a claim under Delaware law for sexual assault and battery. This claim was based on, among other things, the incident in which Greg Games grabbed Konstantopolous by the neck and stated that he would like to kill her. The remaining count, Count IV, asserted a claim under Delaware law by Konstantopolous's husband, Dimos Konstantopolous, for loss of consortium.

In June 1993, the district court granted summary judgment in favor of Westvaco with respect to the counts of the complaint (Counts III, IV, and V) that asserted claims under state law. The court stated that "the facts of record clearly indicate that the alleged incidents arose out of [Konstantopoulos's] work relationship with the tortfeasor-employees as opposed to any affair or personal relationship originating outside the workplace," and the court therefore held that the tort claims based on these incidents were barred by the Delaware Workmen's Compensation Act. 6/4/94 Dist. Ct. Op. at 11. For similar reasons, the court denied the plaintiffs' motion to amend the complaint to add a claim of negligent infliction of emotional distress. See id. at 18. In addition, since Dimos Konstantopoulos's claim in Count IV was derivative of Counts III and V, the court granted summary judgment on Count IV as well. See id. at 12 n.4.

7

The remaining Title VII claims were tried without a jury in August 1993. After the trial, the court found that Westvaco had violated Title VII by subjecting Konstantopolous to a discriminatorily hostile or abusive work environment during the period from April 15 through August 27, 1989. See 6/30/94 Dist. Ct. Op. at 31-35. The court observed that while "one can find examples of conduct more severe than that evidenced of record," "[Konstantopolous's] testimony remains essentially undisputed on the record and evidences some physically threatening and/or humiliating discriminatory conduct." Id. at 33-34. The court further concluded that Konstantopolous's "work performance was directly related to the discriminatory conduct alleged, i.e., the failure to train." Id. at 34. The court then stated:

Having reviewed "all the circumstances," and although the circumstances at bar are not so egregious as in other cases, the Court concludes that a reasonable woman would find the conduct evidenced of record to be sufficiently offensive as to alter the conditions of her employment.

Id.

The district court further found that Westvaco "knew or should have known of the harassment and failed to take proper remedial action" during the period in question. 6/30/94 Dist. Ct. Op. at 34. The court noted that, although Konstantopolous was transferred to a new tour after the meetings on June 21, 1989, Westvaco "did nothing to ensure that [her] new work environment would be any different from the one she was leaving." Id. at 35. The court continued:

Plaintiff's new foreman, Larry Cahall, was not informed of plaintiff's complaints; he, therefore, did not formally address the matter of additional training for plaintiff on the machinery and never addressed at all any additional training for the crew regarding defendant's policy against sexual harassment. It is clear from the record that defendant generally failed to provide its employees with the information and mechanisms necessary to successful effectuate its policies against

8

discrimination. It is clear from the record as well that defendants specifically failed to remedy the hostile work environment encountered by plaintiff during the period April 15 through August 27, 1989.

Id. As relief for this period, the court awarded back pay but declined to award front pay because the court found that Konstantopolous had failed to mitigate damages. See id. at 37-38.

The district court "decline[d] . . . to extend the hostile work environment characterization past August 1989." 6/30/94 Dist. Ct. Op. at 35. The court noted that Konstantopoulos was " `ready, willing and able' to return to work (without any further discussions with defendant regarding the work environment) by October 1989 and continued to so affirm through April 25, 1990." Id. The court therefore concluded that "the incidents alleged by plaintiff in April 1990 [were] sufficiently removed in time to be considered independently from those occurring in 1989." Id. Moreover, the court wrote that those incidents, "considered independently, were neither severe nor pervasive enough to have created a hostile work environment." Id. at 35-36. Finally, the court found, based in part on Konstantopolous's "apparent attitude in April 1990," that her "inability to work in April 1990 and thereafter [was] not necessarily related to[Westvaco's] conduct." Id. at 36. The court also concluded that the conditions of Konstantopolous's employment in April 1990 were not so intolerable that a reasonable person in her position would have resigned, and the court therefore held that she had not been constructively discharged. See id. at 36-37.

Sherlyn and Dimos Konstantopolous then took this appeal. After briefing and oral argument, we certified two questions of state law to the Supreme Court of Delaware. Certification was accepted, and the Supreme Court of Delaware provided a response that we discuss in part III of this opinion.

II.

We turn first, however, to Konstantopoulos's Title VII arguments.

A. Konstantopolous first contends that the district court improperly evaluated the events that occurred during her second period of employment in isolation and that instead the court should have viewed them as a continuation of the harassment that had taken place seven months earlier. We hold, however, that the district court applied the correct legal standard and that its conclusion about the duration of the hostile or abusive environment to which Konstantopoulos was subjected is supported by the facts.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). See also Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment.' " Meritor Sav. Bank, 477 U.S. at 67 (citation omitted). The plaintiff must subjectively perceive the environment to be hostile or abusive, and conditions must be such that a reasonable person would have the same perception. Harris, 510 U.S. at 21.

The Supreme Court has stated that a determination whether an environment is hostile or abusive can be made "only by looking at all the circumstances." Harris, 510 U.S. at 23. See also Meritor Sav. Bank, 477 U.S. at 68. This court has similarly stressed that the "totality of the circumstances" must be examined, Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990), and has "precluded an individualized, incident-by-incident approach" to making such a determination. West v. Philadelphia Elec. Co., 45 F.3d 744, 756 (3d Cir. 1995).

In this case, the district court expressly stated that it had examined the totality of the circumstances. See Dist. Op. at 30, 34. Konstantopoulos argues, however, that the court merely "paid lip service" to this principle and "then treated the incident of April 19, 1990 in isolation." Appellants' Br. at 22. In making this argument, Konstantopoulos focuses on the court's statement that the events of April 1990 were " `sufficiently removed in time to be considered independently from those occurring in 1989 and,

10

considered independently, were neither severe nor pervasive enough to have created a hostile work environment.' " Appellants' Br. at 19 (quoting Dist. Op. at 35-36) (emphasis added in appellants' brief). We do not believe that Konstantopoulos has fairly interpreted the district court's opinion. A fairer interpretation, in our view, is that the district court found that the effects of the harassment that occurred from April through August 1989 had dissipated by the time that Konstantopolous returned to work in April 1990; that, therefore, without any new incidents of harassment, there would be no basis for concluding that the working environment in April 1990 was hostile or abusive; and that the few incidents that occurred when Konstantopolous returned were not sufficiently numerous or severe to warrant the conclusion that the working environment remained hostile or abusive. We see no error in this mode of analysis.

Moreover, we conclude, based on our own examination of the record, that Konstantopolous was not subjected to a hostile or abusive working environment when she returned to work in April 1990.[1] Like the district court, we find several factors that support this conclusion. First, the passage of nearly seven months between the end of Konstantopolous's first period of employment and the

---

1. The parties disagree regarding the standard of appellate review that should be applied to the district court's conclusion that Konstantopoulos was not subjected to a hostile or abusive working environment in April 1990. Konstantopoulos contends that the standard of review is plenary (Appellant's Br. at 1) while Westvaco argues that the appropriate standard is clear error. Appellee's Br. at 1. Neither party, however, has briefed this issue, on which the courts of appeals are divided. Compare Crawford v. Medina General Hosp., 96 F.3d 830, 835-36 (6th Cir. 1996), (question of fact reviewed for clear error), and Amirmokri v. Baltimore Gas & Electric Co., 60 F.3d 1126, 1130 (4th Cir. 1995) (same), with Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995) (mixed question subject to de novo review). The Supreme Court "has long noted the difficulty of distinguishing between legal and factual issues." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401-02 (1990). See also, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982). Here, we find it unnecessary to decide which standard of review to apply because under either standard we see no ground for reversing the district court's decision.

11

beginning of the second is significant. This hiatus provided an opportunity for the lingering effects of the prior incidents to dissipate. Second, as the district court noted, after leaving work for medical reasons in August 1989, Konstantopolous herself stated that she was ready, willing, and able to return to work by October 1989 "and continued to so affirm through April 25, 1990," when she eventually returned. 6/30/94 Dist. Ct. Op. at 35. Thus, Konstantopolous's conduct suggests that, in her mind, the effects of the prior incidents had dissipated well before she actually returned to work. Third, the nature of the incidents that took place when Konstantopolous returned is important. Although we can well understand why Konstantopolous would be troubled by the mute gestures made by Marshall and Peterman -- squinting their eyes and shaking their fists -- this incident cannot in itself be characterized as particularly severe. Moreover, the only other incident cited by Konstantopoulos -- the throwing away of her lunch -- seems minor, since it is not clear that Konstantopolous's name was on the bag, and the offending co-worker stated that he had thrown it away accidentally. Id. at 19. Fourth, it is apparent that Westvaco sought to prevent any harassment of Konstantopoulos when she returned to work and provided procedures by which any improper conduct by co-workers could have been remedied. As previously noted, foreman Larry Cahall warned the crew that he would not tolerate any harassment of Konstantopoulos and assured her that he would be available in his office if she needed him. He also made frequent, unannounced visits to the Web Department and "spent more time than he normally would in the area." 6/30/94 Dist. Ct. Op. at 18. Konstantopoulos, however, made no complaints to Cahall either during or after her shift, and when she returned to work the next day with a physician's note stating that she had been advised to stay off work for six to eight weeks, she commented:"Am I fired?" All of these factors seem to us to suggest that Konstantopoulos was not subjected to hostile or abusive environment when she returned to work in April 1990.

To be sure, there are factors that point in the opposite direction. One of these is the severity of the conduct of her co-workers during the period from April through August

12

1989. Although the district court observed that "one can find examples of conduct more severe than that evidenced of record," the court added that there was "essentially undisputed" evidence that Konstantopoulos was subjected to "some physically threatening and/or humiliating discriminatory conduct." Another similar factor is Konstantopoulos's assignment to work under circumstances that ensured that she would encounter the co-workers responsible for the prior harassment.

We do not, however, agree with Konstantopolous that her argument is substantially supported by her assignment to work under foremen Hurley and Cahall. We recognize that the prior incidents of abuse by co-workers occurred while Konstantopoulos was working under the supervision of these men, but Konstantopoulos did not report any of the most serious incidents to anyone from Westvaco at the time when they occurred. See 6/30/94 Dist. Ct. Op. at 7, 10. Moreover, when Konstantopoulos briefly worked under Hurley's supervision in April 1990, no alleged acts of sexual harassment occurred, and when she was again assigned to work under Cahall's supervision, he took pains to prevent the recurrence of such abuse. Viewing all of the evidence bearing on Konstantopoulos's working environment in April 1990, including all of the events that took place during her prior period of employment, we agree with the district court that she was not subjected to a hostile working environment in April 1990.

Konstantopoulos argues that requiring her "to [w]ork [w]ith [t]he [v]ery [e]mployees [w]ho [h]ad [s]exually [h]arassed [h]er [s]even [m]onths [b]efore [c]onstituted [a]dditional [s]exual [h]arassment." Appellants' Br. at 23. To the extent that Konstantopoulos is simply arguing that her assignment in April 1990 to work in proximity to Marshall and Peterman is a factor that must be considered in determining whether she was subjected to a hostile or abusive working environment at that time, we readily agree. As we believe we have already made clear, we view this as a significant factor weighing in her favor, but after examining the totality of the circumstances, we conclude that her reassignment to the Web Department and her encounter with Marshall and Peterman are insufficient to

13

justify the conclusion that she was subjected to a hostile working environment when she returned to work.

To the extent that Konstantopoulos goes further and suggests that requiring her to work in proximity to Marshall and Peterman constituted illegal sexual harassment per se, we disagree. As prior decisions of the Supreme Court and our court make clear, the proper test is whether, under all the circumstances, a reasonable person would find the working environment to be hostile or abusive. See Harris, 510 U.S. at 23; West, 45 F.3d at 756; Andrews, 895 F.2d at 1486. We therefore see no justification for adopting the per se rule that Konstantopoulos seems to advocate.

Nor do we believe that Cortes v. Maxus Exploration Co., 977 F.2d 195 (5th Cir. 1992), or Ellison v. Brady, 924 F.2d 872 (9th Cir. 1991), on which Konstantopolous relies, supports such a per se rule. In Cortes, an employee, Cortes, was subjected to severe and persistent sexual harassment by her immediate supervisor, Acero. See 977 F.2d at 197-98. Although Cortes complained about this harassment to her employer's human resources manager, he did nothing to rectify the situation. Id. Eventually, Cortes was transferred to another department, but Acero continued to harass her. Id. Cortes again complained to the human resources manager, but he dismissed her complaints. Id. Eventually, Cortes was informed that she would have to work under Acero's immediate supervision or resign. Id. Although she told the human resources manager that she was afraid to work for Acero, the human resources manager replied that there was nothing that he could do. Id.

Faced with this record, the Fifth Circuit sustained the district court's finding that the employer, Maxus, had subjected Cortes to a hostile or abusive environment. The court wrote:

Even in light of the strong evidence that Acero had sexually harassed Cortes when she was under his supervision and that when given the opportunity, he had continued to do so even after she was transferred out of his department, Maxus transferred Cortes to this sexually abusive environment. When Cortes expressed her fears about accepting the transfer, Maxus refused

14

to take any remedial measures to protect her. . . . We find no clear error in the district court's conclusion that these acts amounted to sexual harassment within the meaning of Title VII.

Id. at 199.

It is clear to us that Cortes does not stand for the proposition that it is always illegal for an employer to require a prior victim of sexual harassment to return to work in the company of co-workers responsible for the prior harassment. Rather, Cortes, in our view, merely held that the employer in that case violated Title VII by requiring the employee to work in an environment where sexual harassment seemed almost certain and by refusing to take any remedial measures.

Ellison provides somewhat stronger support for Konstantopolous's argument, but we do not interpret it as adopting a per se rule. In that case, a male IRS agent (Gray) persistently expressed a romantic interest in a female agent (Ellison), who did not reciprocate his sentiments and found his conduct to be "weird[ ]," "crazy" and "frighten[ing]." Ellison, 924 F.2d at 874. After Ellison complained to their supervisor, Gray was temporarily transferred from the San Mateo, California, office to the San Francisco office, but he was permitted to return to San Mateo six months later. Id. at 874. The Ninth Circuit held that "Gray's conduct, as alleged by Ellison, was sufficiently severe or pervasive to alter the conditions of Ellison's employment and create an abusive working environment." Id. at 876. Turning to the question whether the Treasury Department had taken sufficient remedial action to shield it from liability under Title VII, the Ninth Circuit concluded that it was unable to determine based on "the scant record" before it "whether a reasonable woman could conclude that Gray's mere presence at San Mateo six months after the alleged harassment would create an abusive environment." Id. at 883. The court stated that it did not "know how often Ellison and Gray would have to interact at San Mateo" and added that "the facts concerning the government's decision to return Gray to San Mateo" warranted further exploration. Id.

15

We do not interpret Ellison as adopting a per se rule. Rather, the court merely held that, based on the facts in the record, it was unable to determine whether the employer's decision to permit the harasser to return to the same office as the victim created an environment that violated Title VII. We recognize that the Ellison court stated that it believe that "in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment." 924 F.2d at 883. Even this statement, however, does not endorse a blanket rule. Rather, it merely states that in some cases (i.e., those involving "particularly severe or pervasive harassment") the mere presence of the harasser "can" be enough to create a hostile environment.

In sum, having considered the totality of the circumstances, we agree with the district court that, although Konstantopolous was subjected to a hostile and abusive working environment during her first period of employment with Westvaco, she was not subjected to such an environment during her brief second period of employment.

B. In light of our conclusion that no hostile work environment existed at the time that Konstantopoulos voluntarily left Westvaco's employ, Konstantopoulos cannot show the necessary predicate to maintain a constructive discharge claim, specifically, that there were "conditions of discrimination" so intolerable that a reasonable person would have resigned.2 Goss v. Exxon Office Sys. Co., 747

_____

2. Even if we had not reached this conclusion, we would reject Konstantopoulos's argument that the district court erroneously rejected her constructive discharge claim "based on what it apparently believed to be additional requirements specified in Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, cert. denied, 114 S.Ct. 441 (1993)." Appellants' Br. at 26. After properly applying the Goss standard for constructive discharge, 6/30/94 Dist. Ct. Op. at 36-37, the district court observed that there are a list of factors that are "commonly cited by employees who claim to have been constructively discharged." Id. Contrary to Konstantopoulos's assertion, the district court did not "procee[d] impermissibly to impose those factors as additional requirements for a constructive discharge claim." Appellants' Br. at 28. The court merely used these factors as an illustrative guide in exactly the same manner as this court used those

16

F.2d 885, 888 (3d Cir. 1984). The district court therefore properly rejected her constructive discharge claim.

C. Konstantopoulos next contends that the district court abused its discretion in excluding the testimony of her expert psychological witness, Jay Ann Jemail, Ph.D., based on trial counsel's failure to comply with relevant pretrial discovery orders. "The trial court's exclusion of testimony because of the failure of counsel to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion." Semper v. Santos, 845 F.2d 1233, 1238 (3d Cr. 1988). In determining whether a district court abused its discretion, we consider:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or wilfulness in failing to comply with the district court's order.

Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-905 (3d Cir. 1977). See also Beissel v. Pittsburgh and Lake Erie R.R. Co., 801 F.2d 143, 150 (3d Cir. 1986) cert. denied, 479 U.S. 1088 (1987). We have also stated that "the importance of the excluded testimony" should be considered. Meyers, 559 F.2d at 904. "[T]he exclusion of critical evidence is an `extreme' sanction, not normally to be imposed absent a showing of wilful deception or `flagrant disregard' of a court order by the proponent of the evidence." Id. at 905 (quoting Dudley v. South Jersey Metal, Inc., 555 F.2d 96, 99 (3d Cir. 1977).

Applying these standards, we hold that the district court properly exercised its discretion in excluding Dr. Jemail's

_____

factors in Clowes, determining that an absence of strong evidence for any of the factors supported a finding that the plaintiff was not constructively discharged. Compare Clowes, 991 F.2d at 1161 and 6/30/94 Dist. Ct. Op. at 36-37. The district court therefore used the proper legal standard.

17

testimony. Two factors strongly support the district court's decision. First, this is clearly a case that involves a " `flagrant disregard' of a court order by the proponent of the evidence." Meyers, 559 F.2d at 905. As noted, the initial complaint in this case was filed in March 1990, and the complaint was finally amended in March 1991. The cutoff date for expert witness discovery was extended at least three times before a final cutoff date of January 1992 was set. Nevertheless, Dr. Jemail did not see Konstantopoulos until January 1993, one year after the cutoff date, and plaintiffs' trial counsel did not advise opposing counsel that Dr. Jemail would be called as an expert witness until a pretrial conference on July 29, 1993, long after Dr. Jemail was first consulted and approximately three weeks prior to the scheduled trial date. Even then, plaintiffs' trial counsel did not fully comply with his discovery obligations relating to Dr. Jemail's testimony, and indeed he had not fully met those obligations when the district court held, on August 13, 1993, that Dr. Jemail's testimony would be excluded. Based on these facts alone, we are satisfied that this case qualifies as one involving flagrant disregard of the pretrial order.3

Second, we are satisfied that Westvaco was prejudiced. The district court so found, see 8/13/92 Order at ¶ 12, and we accept that finding. As noted, plaintiffs' trial counsel did not advise Westvaco that he intended to call Dr. Jemail until approximately three weeks before the scheduled trial date. Another week elapsed before plaintiffs' trial counsel revealed the substance of Dr. Jemail's expected testimony. See App. 53-56. Counsel listed only two dates -- on August 13 after 3 p.m. and August 17, after 4 p.m. -- when Dr. Jemail would be available for deposition, and no report written by Dr. Jemail was ever turned over because,

_____

3. Because we find that this case involves a "flagrant" violation of pretrial order, we do not reach the question whether it also involved "willful deception." See Meyers, 559 F.2d at 905 (evidence should be excluded only in cases involving flagrant disregard of a court order or willful deception). As to the question of willfulness in this case, see footnote 7, infra.

counsel stated, Dr. Jemail did not prepare one. Under these circumstances, the finding of prejudice was justified.4

The district court did not make findings with respect to several of the other factors mentioned in Meyers -- the importance of Dr. Jemail's testimony, trial counsel's good or bad faith, Westvaco's ability to cure the prejudice, and the extent to which waiver of the rule against calling unlisted witnesses would have disrupted the orderly and efficient trial of this or other cases.5 However, it is apparent that none of these factors weighs heavily against the exclusion of Dr. Jemail's testimony, and therefore a remand for further findings is not necessary. With respect to the importance of Dr. Jemail's expected testimony, it appears that some, but not all, of her testimony was covered by the testimony of another plaintiffs' witness, Dr. Antonio Sacre,

_____

4. We are likewise satisfied that Westvaco was surprised when, 18 months after the extended discovery cutoff and approximately three weeks before trial, plaintiffs' trial counsel informally notified it during a pretrial conference that he intended to call a previously undisclosed expert witness. Konstantopoulos argues:

Westvaco could not have been genuinely surprised by the addition of Dr. Jemail as a witness. Not only did Westvaco know that Ms. Konstantopoulos' psychological condition and the cause of that condition were hotly contested issues in the case, but had also known since January 1993 that Ms. Konstantopoulos was seeing a new psychologist.

Appellants' Br. at 41. This is surely a strange argument. Konstantopoulos would have us believe that, prior to July 29, 1993, her trial counsel did not know that he would seek to call Dr. Jemail as an expert witness and thus should be excused for failing to disclose that intention any sooner, id. at 37-38, but at the same time Konstantopoulos argues that Westvaco should have guessed well before July 29, 1993, that her trial counsel would have to and would attempt to add a previously undisclosed psychological expert witness. Konstantopoulos cannot have it both ways.

5. A trial court's failure to state on the record its reason(s) for excluding experts is not necessarily an abuse of discretion. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 302 (3d Cir. 1991). When a trial court does not state its reasons for exclusion, the reviewing court may apply the Meyers factors to the trial court's decision to determine if the court abused its discretion. Beissel, 801 F.2d at 150-51.

19

the psychiatrist who treated Konstantopoulos.6 We do not regard this factor as particularly favorable to either side in this case.

We are likewise convinced that the issue of trial counsel's good or bad faith cannot weigh significantly in Konstantopoulos's favor.7

The parties dispute whether Konstantopoulos's trial counsel promptly notified Westvaco after making the final decision to call Dr. Jemail as an expert witness. Westvaco contends that Konstantopoulos's trial counsel made that decision months before he eventually notified Westvaco at the July 29, 1993, pretrial conference.8  By contrast,

_____

6. Konstantopoulos maintains that Dr. Jemail would have testified to "(1) the nature of [plaintiff's] emotional problems; (2) the cause of those problems (i.e., the sexual harassment); (3) [plaintiff's] therapeutic needs; (4) the results of the MMPI-2; and (5) the questionable validity of the testing done by [defendant's experts]." Appellants' Br. at 33. However, the first three subjects were covered in the testimony of Dr. Sacre. The only subject not covered by plaintiff's experts were the results and validity of the MMPI-2 test. Konstantopoulos sought to impeach the credibility of defendant's expert, Dr. Raskin, by casting doubt on the applicability and reliability of the MMPI-2. Dr. Raskin did not refer to the test by name on direct examination, but indicated that some of his conclusions were based on psychological testing.

7. The district court made no finding regarding trial counsel's good or bad faith. On appeal, Konstantopoulos notes that Westvaco urged the district court to find that her trial counsel acted in bad faith but that the district court failed to do so. She then suggests that the district court rejected the proposition that her trial counsel was guilty of bad faith. See, e.g., Reply Br. at 12. We disagree with this characterization of the district court's order excluding Dr. Jemail's testimony. Making no finding on the question of bad faith (which is what the district court did) is quite different from finding that there was no bad faith.

8. Relying on time sheets submitted by Konstantopoulos's trial counsel in connection with his application for attorney's fees, Westvaco contends that trial counsel prepared a subpoena for Dr. Jemail and paid her bill in February 1993. If it were necessary for purposes of this appeal to determine when trial counsel decided to call Dr. Jemail as an expert witness, we would remand this case to the district court for an exploration of the significance of these facially troubling records, which were not called to the attention of the district court in relation to the question of trial counsel's alleged bad faith. However, because we do not think that it is necessary to make this determination, we do not find a remand to be essential.

20

Konstantopoulos argues that her trial attorney did not make that final decision until shortly before the pretrial conference. However, Konstantopoulos does not dispute the fact that trial counsel had been preparing for the possibility of calling Dr. Jemail as a witness for some months.9 Yet despite this, despite the fact that the cutoff for expert discovery had passed more than a year earlier, and despite the fact that the trial date was rapidly approaching, trial counsel delayed notifying Westvaco. It seems clear that trial counsel was, at best, attempting to gain a tactical advantage by delaying notification of Westvaco until the last possible date that could plausibly be claimed as the date on which the final decision about calling Dr. Jemail had been made. This approach was not commendable, and the intentions of Konstantopoulos's trial counsel therefore cannot possibly weigh appreciably in her favor.10

_____

9. Konstantopoulos's trial attorney admitted that, as of January 1993, Jemail was being considered for "possible testimony." App. 53. Konstantopoulos's counsel asserted that in January 1993, he "did not know whether [Jemail] was seen for purposes of testimony or treatment or both." Id.

10. Konstantopoulos tries to characterize her trial counsel's failure to list Jemail and disclose the substance of her testimony and test results as "excusable delay," akin to the "lack of diligence" that was held not to constitute bad faith in In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 793 (3d Cir. 1994), cert. denied, General Electric Co. v. Ingram, 115 S.Ct. 1253 (1995). That case is inapposite. There, the expert had been identified and the substance of most of his testimony had been disclosed prior to the discovery date. The plaintiff's delay in providing part of the testimony after substantial compliance was held to be excusable.

The instant case is more closely analogous to Sowell v. Butcher & Singer, Inc., 926 F.2d 289 (3d Cir. 1991). Several years before trial, the plaintiff in that case had been served with interrogatories, requesting the identification of experts and a summary of the substance of their testimony. See id. at 301. The plaintiff failed to list the experts until shortly before trial and did not indicate what the substance of their testimony would be. See id. "The record include[d] a detailed exchange of correspondence between the parties' attorneys documenting the refusal of [plaintiff's] counsel to make his experts available or to supply information regarding the substance of their testimony." Id.

Here, as in Sowell, "Counsel . . . failed to satisfy the obligations imposed upon him by the rules of discovery and cannot now be heard to complain that the district court erred in failing to admit expert testimony." Sowell, 926 F.2d at 302.

21

We are unmoved by Konstantopoulos's argument that Westvaco could have "cured" the prejudice resulting from trial counsel's late designation of Dr. Jemail as an expert witness. The thrust of Konstantopoulos's argument is that Westvaco, by means of sufficient last-minute scrambling, could have managed to prepare to meet Dr. Jemail's expected testimony at trial. Even if this is true, however, Konstantopoulos would have gained a valuable tactical advantage by requiring Westvaco to focus its litigation resources on these efforts in the last days before trial. Finally, even if we assume that permitting Dr. Jemail to testify would not have disrupted the commencement or the progress of the trial in this case, that factor, either alone or in conjunction with the other relevant factors, would not persuade us that the district court's decision to exclude Dr. Jemail's testimony constituted an abuse of discretion.

In sum, after examining all of the factors identified in our prior cases, we hold that the district court did not abuse its discretion, and we therefore sustain its decision.

III.

The final question that we must address is whether the district court correctly held that the plaintiffs' state-law claims were barred by the Delaware Workmen's Compensation Act. The Act restricts an employee's ability to assert a tort claim against his or her employer for "personal injury or death by accident arising out of and in the course of employment." Del. Code Ann. tit. 19, § 2304 (1996). However, the Act does not prevent an employee from recovering in tort for "any injury caused by the wilful act of another employee directed against the employee by reasons personal to such employee and not directed against the employee as an employee or because of the employee's employment." Del. Code Ann. tit. 19, § 2301(15) (1996).

As previously noted, the plaintiffs' amended complaint asserted three tort claims under Delaware law. Count III, which asserted a claim for intentional infliction of emotional distress, alleged that Westvaco and its agents and employees intentionally inflicted acts of sexual harassment and retaliation on Konstantopoulos. Count V, which

22

asserted a claim for sexual assault and battery, alleged that Westvaco was liable principally as a result of the incident in which Konstantopoulos's co-worker Greg Games violently grabbed her by the neck and stated: "I'd like to kill you." Finally, Count IV asserted a derivative claim for loss of consortium on behalf of Konstantopoulos's husband.

The district court held that all of these claims were barred by the Delaware Workmen's Compensation Act. The plaintiffs argued that these claims fell within the "personal dispute exception" contained in Del. Code Ann. tit. 19, § 2301(15), but the district court disagreed. The court wrote:

[T]here is no evidence of a pre-existing private affair or dispute between plaintiff and any of her co-workers. To the contrary, the record is replete with evidence that any alleged misconduct occurred solely as a result of the tortfeasor-employees' relationship with the plaintiff at work. . . . [T]he tortfeasors' actions were related to the duties of their jobs; the duties of the tortfeasors required them to work together or to be in close proximity or to communicate with the plaintiff; the incidents were stimulated by duties, assignments, or conditions of work; and the incidents resulted from the fact that plaintiff was an employee of this particular employer. Accordingly, the facts of record clearly indicate that the alleged incidents arose out of the plaintiffs' work relationship with the tortfeasor-employees as opposed to any affair or personal relationship originating outside the workplace.

6/4/93 Dist. Op. at 11.

On appeal, the plaintiffs argue that the "personal dispute exception" does not apply when an employee sexually harasses a co-worker for purely personal reasons. The plaintiffs contend that the record bears "no evidence as to why Ms. Konstantopoulos' co-workers . . . assaulted her" and that "[o]ne definite possibility was that they were motivated by personal bias against Ms. Konstantopoulos as a woman." Appellant's Br. at 49. Accordingly, the plaintiffs maintain, summary judgment on the state-law claims was improper.

23

Because we found no decision of the Supreme Court of Delaware that definitively addressed the state-law issues raised in this appeal, we certified two questions of state law to that court pursuant to Article IV, Section 11(9) of the Delaware Constitution and Delaware Supreme court Rule 41.11 The Delaware Supreme Court accepted certification and provided responses that, in our view, require affirmance of the district court's decision.

Our certification included the following query:

Are an employee's claims against her employer for intentional infliction of emotional distress and sexual assault and battery caused by acts of sexual harassment performed by co-employees arising out of and in the course of employment, and not based on any events occurring outside the course of employment, barred by the Delaware Workmen's Compensation Act, Del. Code Ann. Tit. 19, § 2301 et seq. (1985), or may they be included in the exception to the Act found at Del. Code Ann. Tit. 19 § 2301(15)(b)?

In response, the Delaware Supreme Court concluded that under the Act, "an employee's claim against her employer for personal injuries sustained during the course of employment, even if the offending conduct was of a sexual nature, is limited to the compensation provided by the Act."

_____

11. The certified questions were:

(1) Are an employee's claims against her employer for intentional infliction of emotional distress and sexual assault and battery caused by acts of sexual harassment performed by co-employees arising out of and in the course of employment, and not based on any events occurring outside the course of employment, barred by the Delaware Workmen's Compensation Act, Del. Code Ann. Tit. 19, § 2301 et seq. (1985), or may they be included in the exception to the Act found at Del. Code Ann. Tit. 19 § 2301(15)(b)? Does the applicability of this exception depend in whole or in part on the subjective intent of the employee or employees who engage in the harassment?

(2) If these claims are included in the exception found at Del. Code Ann. tit. 19 § 2301(15)(b), may the employer be held liable based on the doctrine of respondeat superior?

24

Konstantopoulos v. Westvaco Corp., 1996 WL 580354 (Del. Supr. Oct. 2, 1996) at 1. The court went on to conclude that the "personal dispute exception" contained in Del. Code Ann. tit. 19, § 2301(15)(b) does not apply under the facts set out in the certified question. Konstantopoulos, 1996 WL 580354 at 2. The court reasoned that the "personal dispute exception" is "restricted to an injury that is caused by conduct with origins outside of the work place." Id. Since our certified question referred to conduct arising "out of and in the course of employment" and "not based on any event occurring outside of the workplace," the court concluded that "[t]his type of conduct clearly does not fall within the exclusion provided for an act `. . . not directed against an employee as an employee or because of the employee's employment.' " Id. (quoting Del. Code Ann. tit. 19, § 2301(15)(b) (emphasis added in Del. Sup. Ct. Op.). The court further observed that its interpretation of the act was compatible with its purpose and that "[i]t would not be appropriate for [the court] to create a new exception . . . for sexual harassment claims." Id. at 3. In view of the Delaware Supreme Court's responses, it is apparent that the district court's disposition of the plaintiffs' state-law claims must be affirmed.

For the reasons explained above, we affirm the decision of the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

25