**Donald E. BEISSEL, Appellant,**

v.

**The PITTSBURGH AND LAKE ERIE RAILROAD COMPANY, a corporation.**

No. 85–3728.

United States Court of Appeals, Third Circuit.

Argued June 18, 1986.

Decided Sept. 15, 1986.

Paul L. Hammer (argued), Pittsburgh, Pa., for appellant.

Richard D. Klaber (argued), Pittsburgh, Pa., for appellee.

Before SEITZ, HUNTER and MANS-MANN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The plaintiff appeals from a jury verdict in favor of the defendant in this case filed pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60. The plaintiff, who allegedly suffered injuries in the course of his employment, challenges the trial court's refusal to submit to the jury a separate claim pursuant to the Safety Appliance Acts, 45 U.S.C. §§ 1–16, its refusal to instruct the jury on the doctrine of res ipsa loquitur, and its refusal to prohibit the testimony of a "surprise witness".

We find that the district court did not err in its rulings on the res ipsa loquitur charge or the testimony of the "surprise witness." We hold, however, that the district court did err when it refused to submit the Safety Appliance Acts claim to the jury. Accordingly, we will affirm the entry of judgment in favor of the defendant on the negligence claim but will remand the case for a new trial on the Safety Appliance Acts claim.

I.

The plaintiff allegedly sustained back injuries in the course of his employment when he slipped on the step of the defendant's 1969 Dodge van. The van had been converted for use on both the highway and on the rails. This conversion included the additions of extra wheels designed to fit on railroad tracks and of footboards or sill steps.

At the time of the accident, the plaintiff and Warren Mayfield, both employees of the defendant, were assigned to transport the high/rail vehicle by highway from Glassport to McKees Rocks, Pennsylvania. The two men had stopped at a convenience store and were returning to the van with coffee when the plaintiff was injured.

Mr. Mayfield testified that, at the time of the accident, he was not looking at the plaintiff but was concentrating instead on his efforts to tear a hole in the lid of his coffee cup. The plaintiff testified that, having placed his cup of coffee on the shelf inside the van, he put his right foot on the sill step and his left foot on the step of the van. The plaintiff claims that the sill step then gave way and that he was injured in the resulting fall.

The plaintiff filed suit against the defendant pursuant to the FELA, alleging negligence and a violation of the Safety

Appliance Acts. The trial judge refused to submit the Safety Appliance Acts claim to the jury, charging only on the negligence claim. The jury returned a verdict in favor of the defendant. The trial court denied the plaintiff's subsequent motions for a new trial and for judgment notwithstanding the verdict.

The plaintiff appeals alleging that the district court erred in refusing to send the plaintiff's Safety Appliance Acts claim to the jury, that the court improperly refused to charge the jury on the doctrine of res ipsa loquitur, and that the court erred in permitting a "surprise witness" to give prejudicial and irrelevant testimony.

## II.

The trial court refused to submit to the jury the plaintiff's claim that the defendant should be found liable for the plaintiff's injuries because those injuries resulted from a violation of the Safety Appliance Acts ("Acts"). The plaintiff contends that the defendant violated a regulation issued pursuant to Section 11 of the Acts, 49 C.F.R. § 231.25(c), when it permitted its employees to use the multi-purpose vehicle equipped with a sill step which allegedly was not securely fastened.

The defendant does not contest the plaintiff's assertion that the record contains sufficient evidence to support a determination that the step was loose. The defendant argues instead that the Safety Appliance Acts were not applicable to the vehicle because the van was not on a railroad track at the time of the incident.

█ The Safety Appliance Acts impose an absolute duty on railroad carriers to maintain the required safety equipment on their vehicles. *See Lilly v. Grand Trunk Western Railroad Company,* 317 U.S. 481, 485–86, 63 S.Ct. 347, 350–51, 87 L.Ed. 411 (1943). An employee who is injured by reason of a violation of the Acts may pursue a cause of action against the carrier pursuant to the FELA. *Id.* at 485, 63 S.Ct. at 350. In short, the Safety Appliance Acts provide the basis for the claim, and the FELA provides the remedy. T.J. Lewis, Jr., *Federal Employers Liability Act,* 14 S.C.L.Q. 447, 452 (1962).

If the Acts were applicable to the multi-purpose vehicle at the time of the incident, the trial court erred in refusing to charge the jury on the Safety Appliance Acts claim. The standard of proof required of a plaintiff alleging a Safety Appliance Acts claim is less stringent than for an FELA negligence claim. Thus, irrespective of our resolution of the negligence claim, an error in the court's refusal to submit the Safety Appliance Acts question to the jury would require a remand for a new trial on that portion of the complaint.

Section 11 of the Acts provides, in relevant part:

It shall be unlawful for any common carrier subject to the provisions of sections 11 to 16 of this title *to haul, or permit to be hauled or used on its line,* any car subject to the provisions of said sections not equipped with appliances provided for in said sections, to wit: All cars must be equipped with secure sill steps....

45 U.S.C. § 11 (emphasis added). Section 12 of the Acts gives the Secretary of Transportation authority to issue appropriate regulations and provides that "it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the standard so prescribed by the Secretary." 45 U.S.C. § 12.

Prior to the 1957 decision of the Supreme Court of the United States in *Baltimore & Ohio Railway Company v. Jackson,* the Interstate Commerce Commission[1] ("ICC") did not consider "track motor cars," a category which includes high/rail vehicles, to be subject to the provisions of the Safety Appliance Acts. 353 U.S. 325, 330, 77 S.Ct. 842, 845, 1 L.Ed.2d 862 (1957) *("Jackson");* Applicability of Safety Regulations to

---

1. Power to enforce the Safety Appliance Acts was originally vested in the Interstate Commerce Commission. In 1966, those duties were shifted to the Secretary of Transportation. 49 U.S.C. § 1655(e)(1).

Track Motor Cars and Push Trucks, 325 I.C.C. 722, 724 (1965). In *Jackson*, the Supreme Court held that a track motor car and the hand car to which it was coupled were within the scope of the Safety Appliance Acts:

> The power or train brake provisions of the Safety Appliance Acts apply to the motor track car and the coupling and brake requirements to the hand car when they are employed in the manner here involved [the motor track car was hauling the hand car on the defendant's railroad track].

*Jackson*, 353 U.S. at 328, 77 S.Ct. at 844.

The *Jackson* Court did not decide, however, whether similar track motor cars or hand cars, if used separately, were governed by those sections of the Acts. The Court explained: "If used separately, though we do not pass on the question, it may well be that entirely different sections of· the Acts might apply to each of the vehicles." *Id.*

The ICC, in response to the *Jackson* decision, instituted rulemaking proceedings for the purpose of promulgating regulations consistent with the Court's interpretation of the Safety Appliance Acts. Applicability of Safety Regulations to Track Motor Cars and Push Trucks, 325 I.C.C. 722, 722 (1966). These proceedings culminated in the promulgation of 49 C.F.R. §§ 231.25 & 231.26. The portions of the regulations which are pertinent to this appeal specify:

> § 231.25 Track Motorcars (self-propelled 4–wheel cars which can be removed from the rails by men).
>
> . . . .
>
> (c) *Sill steps or footboards.* Each track motorcar shall be equipped with safe and suitable sill steps or footboards conveniently located and securely fastened to car when bed or deck of track motorcar is more than 24 inches above top of rail.

A "note" which follows Section 231.26 provides: "Sections 231.25 and 231.26 are applicable only when the vehicles governed thereby are coupled together and moved together."

The apparent intent of the ICC was to limit the scope of the regulations. Thus, because the *Jackson* Court expressly declined to consider whether track motor cars which are operated separately are governed by the Acts, the Commission did not address such operation of track motor cars in its rulemaking proceeding and specifically included the note limiting the regulations to cars coupled and moved together. Similarly, although it conceded that the term track motor car encompasses high/rail vehicles among others, the Commission directed its regulations to a more limited group of cars, *i.e.*, "self-propelled 4–wheel cars which can be removed from the rails by men." *See* Applicability of Safety Regulations to Track Motor Cars and Push Trucks, 325 I.C.C. 722, 724–25 (1965); *cf.* Applicability of Safety Regulations to Track Motor Cars and Push Trucks, Report & Order of Hearing Examiner, I.C.C. docket No. 32248, at 4 (February 10, 1965) (Vinskey, Henry J.) ("Although there are other self-propelled maintenance-of-way vehicles which are comparable to or related to track motor cars, such as rail highway automobiles and trucks, weed burners, cranes and others, they are not within the scope of this proceeding.").

The ICC did indicate, however, that vehicles which do not fall precisely within the scope of 49 C.F.R. § 231.25 may nonetheless be subject to the provisions of the Acts. With respect to the vehicles not covered by the *Jackson*-initiated rulemaking, the Commission's hearing examiner wrote: "[A]ttention is called to Section 131.18 [now 231.18] of the United States Safety Appliance Standards which applies to cars of special construction not specifically covered by the standards." Applicability of Safety Regulations to Track Motor Cars and Push Trucks, Report & Order of Hearing Examiner, I.C.C. docket no. 32248, at 4 (February 10, 1965) (Vinskey, Henry J.). Section 231.-18 provides:

> Cars of construction not covered specifically in the foregoing sections in this part, relative to handholds, sillsteps, ladders, handbrakes, and running boards may be considered as of special construc-

tion, but shall have, as nearly as possible, the same complement of handholds, sillsteps, ladders, handbrakes and running-boards as are required for cars of the nearest approximate type.

49 C.F.R. § 231.18.

This regulation seemingly requires that high/rail vehicles comply, as nearly as possible, with the Section 231.25 requirements. The sill step allegedly involved in the plaintiff's injury was, in fact, apparently designed to satisfy the provisions of Section 231.25(c).

■ We can find no reasonable justification for excluding high/rail vehicles operated separately from the provisions of 49 C.F.R. §§ 231.18 & 231.25(c) or from the dictates of Section 11 of the Acts. Unlike the regulations governing couplers, the requirements for sill steps are based on considerations not necessarily linked to the movement of a coupled "train". Our reading of Section 11 of the Acts reveals no language limiting the application of its requirements to coupled cars. Section 11 addresses any car "hauled or used" on a carrier's "line". 45 U.S.C. § 11. While the *Jackson* Court did not extend its ruling on couplers and power brakes to uncoupled vehicles, it certainly did not preclude the application of the Acts to such cars. It merely suggested that the applicable sections of the Acts might vary where a car was used separately and not as a "train."

Having decided that an uncoupled high/rail vehicle is subject to the sill step requirements of Section 11 of the Safety Appliance Acts, we confront the more difficult issue presented by a claim involving a high/rail vehicle which is in use on the highway and not on the rails. The defendant argues that the scope of the Section 11 requirements is limited to vehicles in use on railroad tracks. The defendant focuses on the language of Section 11 which directs its provisions to carriers which haul or use any car "on its line." The defendant argues that the plain meaning of this language prevents Section 11's application to the vehicle at issue which "was not hauled [or] ... used on any line of the P&LE or any other railroad." The defendant contends that the language's clear meaning reflects Congress' concern with the hazards to railroad employees who worked on or around locomotives, cars or similar vehicles in use on the track and, in certain circumstances, in railroad yards.

When it enacted Section 11 in 1910, Congress undoubtedly had not contemplated the use of high/rail vehicles. As it focused on the generally deplorable safety conditions of the nation's railroad industry, however, Congress used broad terms to define the scope of its pronouncements. As the Supreme Court of the United States noted in *Johnson v. Southern Pacific Company,* with respect to the term "car": "There is nothing to indicate that any particular kind of car was meant. Tested by context, subject matter and object, 'any car' meant all kinds of cars running on the rails, including locomotives." 196 U.S. 1, 15–16, 25 S.Ct. 158, 160–61, 49 L.Ed. 363 (1904) (quoted in *Jackson,* 353 U.S. at 331–32, 77 S.Ct. at 846).

■ The advent of the high/rail vehicle, which is capable of unassisted movement on both rail and highway, although not contemplated in the legislative history, may nonetheless fall within the statute's scope. The Section 11 language which requires use of a car on a carrier's "line" need not be limited to the carrier's railroad track. Where use of its cars on the highway is an integral part of a railroad carrier's operation, the employer may not escape liability merely because an employee is unfortunate enough to be injured by a defective sill step while the vehicle is on the highway and not on rail.

Our reading of the statute is also consistent with Section 12 of the Acts which provide that "it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the stan-

dard so prescribed by the Secretary." 45 U.S.C. § 12.

Despite the defendant's arguments to the contrary, nothing in our decision in *Patton v. Baltimore & Ohio Railroad Company*, 197 F.2d 732 (3d Cir.1952), precludes this result. In *Patton*, we reversed the imposition of liability against a company which had transferred the defective vehicles to another private railroad company with its own capacity to repair defective cars. *Id.* at 740–41. We held only that "[t]he Act did not provide that ownership or *prior* use by the railroad of a car or cars with insufficient brakes would serve as the basis for the absolute liability imposed on the carrier by the Act." *Id.* at 741 (emphasis in original). The high/rail vehicle in question here was concededly always in the possession of the defendant and was being operated on the defendant's instructions. This is not the case of a car which has been taken off the line for repair or because it is out of service. The defendant's van was being used in the regular course of business, on both rail and highway. The defendant had equipped the vehicle for rail and provided the required sill steps. So long as it continued to use the multi-purpose vehicle in this dual capacity, it was required by Section 11 of the Safety Appliance Acts to maintain a secure step.

We hold, therefore, that the district court erred in failing to charge the jury on the Safety Appliance Acts claim and that this error warrants a new trial.

### III.

The plaintiff contends that the trial court erred in refusing to instruct the jury on the doctrine of res ipsa loquitur. In the relevant point for charge, the plaintiff requested that the trial court instruct the jury as follows:

If Mr. Beissel was injured in an unusual happening arising from conditions at his work for the P&LE, the burden of proof is shifted to the P&LE and the P&LE must come forward with evidence to show that it was not negligent. [Citations omitted.]

The defendant argues, in response, that the plaintiff waived his right to raise this issue on appeal because the requested instruction does not fully and completely set forth the elements of res ipsa loquitur. The defendant maintains in the alternative that the facts of this case do not warrant a res ipsa loquitur charge.

We find that the plaintiff did not waive his right to challenge the district court's refusal to include a res ipsa loquitur instruction in its charge. We also find that on the facts of this case the court did not err in denying such a charge.

Whatever the alleged inadequacies of the proposed charge as written, the trial court clearly interpreted it as a request for a res ipsa loquitur instruction. At the time the request was denied, there was no suggestion that the language of the charge was erroneous or that it was not a complete statement of the law. Indeed, at the sidebar conference on the points for charge the plaintiff's counsel and the trial court had the following exchange:

MR. HAMMER: You are not going to instruct on res ipsa loquitur?

THE COURT: No, I don't, except maybe I will say that when things break down that are not supposed to break down if properly maintained—

MR. HAMMER: They may infer that there is negligence.

THE COURT: (Continuing) They may make an inference from that, yes.

MR. HAMMER: Okay. So I may argue that?

THE COURT: But that's probably one time I would prefer to avoid—unusual for me—the Latin phrase res ipsa loquitur, or even the other equivalent, exclusive control.

The plaintiff's counsel later clarified his objection to the trial court's ruling: "I except to the refusal to give a res ipsa loquitur charge."

■ At argument on the post-trial motions, the plaintiff's counsel argued that "it is reversible error in an FELA case to refuse to give a res ipsa loquitur charge." The district court clearly indicated that, in its view, the plaintiff had requested a res ipsa loquitur charge and that it had been denied.

THE COURT: There is no doubt as to the fact that you requested such a charge.

MR. HAMMER: Yes, and I think there is no doubt that you refused the charge.

THE COURT: There is no doubt it was not granted.

Again, there was no suggestion by the defendant at that time that the plaintiff had not properly requested a res ipsa loquitur charge. We find that the plaintiff did not waive his right to contest on appeal the trial court's denial of the res ipsa loquitur charge.

With respect to the merits of the court's refusal to charge the jury on the doctrine of res ipsa loquitur, the plaintiff argues that the trial court erred in finding that the facts of this case did not warrant such a charge. The defendants, however, contend that several elements of the doctrine are not satisfied by the facts of record.

■ The essential elements of the res ipsa loquitur doctrine were set forth by the Supreme Court of the United States when it first applied the doctrine to an FELA action. *Jesionowski v. Boston and Maine Railroad,* 329 U.S. 452, 456, 67 S.Ct. 401, 403, 91 L.Ed. 416 (1947) (quoting *San Juan Light & Transit Company v. Requena,* 224 U.S. 89, 98–99, 32 S.Ct. 399, 401, 56 L.Ed. 680 (1912). The Court said:

[W]hen a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explana-

tion, that the injury arose from the defendant's want of care.

*Id.* Thus, an inference of causation based on the res ipsa loquitur doctrine requires that (1) the event be of a kind which ordinarily does not occur in the absence of negligence, (2) other responsible causes, including conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence, and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff. Restatement (Second) of Torts, § 328D (1965).

The district court rejected the plaintiff's request for a res ipsa loquitur charge, reasoning: "[I]t seems to me that this sounds like one of the usual cases of accidents on the railroad, rather than something unusual, like the case where one wheel of a car was on the left-hand switch and the other one on the right-hand switch." The court apparently found that the plaintiff had not satisfied the requirement of demonstrating that the injury was one which does not ordinarily occur in the absence of the negligent control of the thing causing the injury.

The trial judge compared the facts of this case to those of *Jesionowski.* In *Jesionowski,* a railroad employee was killed by a train which derailed. The derailment could have been attributed either to the deceased's improper operation of a switch or the employer's negligent maintenance of equipment called a "frog." The Supreme Court held that the doctrine of res ipsa loquitur could be applicable if the evidence demonstrated that the deceased had not been at fault.

■ While the *Jesionowski* incident may be appropriately characterized as one which does not ordinarily occur when the employer, who has control of the instrumentality which caused the accident, exercises proper care, the facts of the appeal before us do not support such a conclusion. The trial court was correct in its observation that the plaintiff's injury was one which may be considered usual or common;

it is the type of event which could easily occur in the absence of the defendant's negligence.

The defendant did argue at trial that the plaintiff's actions contributed to or caused the accident. We cannot say, as we did in *Knight v. Otis Elevator Company*, 596 F.2d 84, 90–91 (3d Cir.1979), that there is insufficient evidence that the actions of the plaintiff contributed to plaintiff's injuries. We cannot say with certainty, as we did in *Fassbinder v. Pennsylvania Railroad Company*, 322 F.2d 859, 861 (3d Cir.1963) (in banc), that one of the mechanisms, over which the defendant had exclusive control, was the precipitating cause of the accident.

Consequently, we find that the district court did not err in denying the plaintiff's request for a res ipsa loquitur charge.

### IV.

The plaintiff's final contention is that he is entitled to a new trial because the district court abused its discretion in permitting testimony by William McCracken, a defense witness whose name did not appear on the list of witnesses required by the pre-trial order.

 It is well established that departure from or adherence to the pretrial order is a matter peculiarly within the discretion of the trial judge. *Berroyer v. Hertz*, 672 F.2d 334, 338 (3d Cir.1982). The decision to permit or to exclude testimony by a non-listed witness will not be disturbed absent a clear abuse of discretion. *Id.* The criteria for evaluating such an exercise of discretion are: (1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption of the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliant party. *Id.* In applying these standards to the facts of this case we find that the trial court did not abuse its discretion in allowing McCracken to testify.

The sequence of testimony leading to the defendant's request to call Mr. McCracken may be summarized as follows. On direct examination by his own attorney, the plaintiff testified to back problems in 1965 or 1966 as a result of which he was advised by his doctor to seek lighter duty work. The plaintiff stated that upon his request for lighter work the defendant assigned him to a job which, though less strenuous, still required him to swing sledge hammers weighing from eight to sixteen pounds. At a later point in the trial, the plaintiff was called as a witness for the defense. On direct examination by the defense attorney, the plaintiff was asked if he recalled that in 1974 the defendant through Mr. McCracken and Mr. Netherton, the defendant's general manager, had offered the plaintiff the opportunity to move inside to a lighter job. The plaintiff replied that he did not recall the offer.

The defendant offered Mr. McCracken's testimony to "refute Mr. Beissel's testimony that he was not offered a job in 1974." The plaintiff objected to the offer, first, because Mr. McCracken was an unlisted witness and, second, because the plaintiff had not denied the job offer but merely testified that he didn't recall it. The trial court permitted Mr. McCracken to testify, commenting that the testimony might refresh the plaintiff's recollection. Mr. McCracken testified on direct examination that he and Mr. Netherton had offered the plaintiff a position in the drafting room in 1974.

While the plaintiff may have been surprised that Mr. McCracken was called to testify, he does not claim prejudice from the substance of Mr. McCracken's testimony on direct. The plaintiffs' principal allegation of unfairness involves an expression of opinion by Mr. McCracken in response to a question.

During cross-examination by the plaintiff's attorney, Mr. McCracken testified generally that in 1974 the plaintiff had refused the offer of lighter work and had continued to perform his prior job satisfac-

torily. Then the following exchange occurred:

"Q. And, so, you and Mr. Netherton had gone through this preparation and meeting and that, when it wasn't needed at all.

A. I wouldn't say that."

The plaintiff's counsel posed no further questions, and the defendant's attorney immediately asked on redirect: "What would you say, Mr. McCracken?" Mr. McCracken answered, "I don't think we would be here now if that were the case." The plaintiff objected to the answer as speculative, the trial judge agreed and struck the response.

The plaintiff's principal allegation of unfairness is that the expression of this opinion by Mr. McCracken had a prejudicial impact upon the jury the strength of which is not apparent from the "cold record." We agree with the plaintiff that the record on its face does not reveal significant prejudice from Mr. McCracken's response. Furthermore, even if we assume that some prejudicial impact is lost in transcription, we must next evaluate the plaintiff's ability to cure the prejudice. The plaintiff merely objected to the answer, and the trial judge responded by striking it. The plaintiff made no further attempt to minimize its impact, *e.g.* by requesting an instruction that the jury disregard the answer or by moving for a mistrial.

The record reveals no possibility of substantial prejudice to the plaintiff and no further attempt by the plaintiff to cure any perceived prejudice. We find that the trial court did not abuse its discretion in departing from the pretrial order and in allowing Mr. McCracken to testify.

## V.

Because we reject the plaintiff's contention that the district court erred in refusing

to charge the jury on the doctrine of res ipsa loquitur and in permitting the testimony of Mr. McCracken, we will affirm the entry of judgment in favor of the defendant on the negligence claim.

We hold, however, that the trial court erred when it refused to submit the Safety Appliance Acts claim to the jury. Consequently, we will reverse the entry of judgment on the Safety Appliance Acts claim and will remand the case for a new trial on that claim.

HUNTER, Circuit Judge, concurring.

We agree with the majority that the Safety Appliance Act applies in this case. Although Mr. Beissel was injured when the vehicle in question, the high/rail car, was not on the railroad tracks, the vehicle was subject to the requirements of the Act because it was used both on and off the tracks. We write separately to note that we do not agree with the majority's view that the vehicle is subject to the requirements of the Act simply because its use off the track was an integral part of the railroad carrier's operation. A vehicle that was used as an integral part of the operation but that was never used on the tracks, would not, in our view, be covered by the Act.