Judgment rendered July 17, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,764-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

WALTER HARRIS                                    Plaintiff-Appellant

versus

THE KANSAS CITY                                  Defendant-Appellee
SOUTHERN RAILWAY
COMPANY

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 615,149

Honorable Brady O'Callaghan, Judge

* * * * *

BROUSSARD, DAVID & MOROUX                        Counsel for Appellant
By: Blake R. David
    Reed K. Ellis

THE YOUNGDAHL LAW FIRM, P.C.
By: Sara Youngdahl

WILKINSON, CARMODY & GILLIAM                     Counsel for Appellee
By: Bobby S. Gilliam
    Holly C. Allen
    Jonathan P. McCartney

* * * * *

Before PITMAN, ROBINSON, and ELLENDER, JJ.

**PITMAN, C. J**.

Plaintiff-Appellant Walter Harris appeals the trial court's increase of damages in his favor in an order granting his motion for judgment notwithstanding the verdict ("JNOV"). For the following reasons, we affirm in part, amend in part and affirm as amended.

## FACTS

On March 14, 2019, Harris filed a petition for damages against Defendant-Appellee Kansas City Southern Railway Company ("KCS"). Harris stated that on December 2, 2018, he was performing his regular duties as a conductor for KCS when the handbrake he was operating failed to release, causing injuries to his back, right leg and other parts of his body. He alleged that he suffered permanent physical impairment; physical and mental pain, suffering and anguish; past and future lost wages; and past and future medical expenses. He argued that his injuries were due in whole or in part to the negligence of KCS and that KCS failed to provide him with a reasonably safe place to work. He contended that KCS violated the Federal Employers' Liability Act ("FELA"), the Federal Safety Appliance Act ("FSAA") and Federal Railroad Administration regulations.

On April 16, 2019, KCS filed an answer. It denied Harris's allegations and stated that he is solely at fault for each injury. In the alternative, KCS pled contributory and/or comparative negligence of Harris. It alleged that Harris failed to mitigate his damages and that any injury preexisted or existed independently of the accident.

A five-day jury trial began on October 31, 2022. Hubert Allen, III, a KCS conductor, testified that he was working with Harris on December 2, 2018, when Harris called him on the radio to come to his location because he

was injured. He did not know how Harris became injured because he was working on the other end of the locomotive. He stated that Harris appeared to be in obvious pain and that he said he hurt himself releasing the brake. He noted that prior to the accident, Harris never complained about back pain or leg pain. Allen testified that during the years they worked together, he observed Harris release a handbrake as taught by KCS, i.e., to climb up on the car, maintain a three-point contact, grab the release and then pull or push it, depending on the type of handle. He noted that there are rules about how not to use excessive force or to twist the body while operating a handbrake.

Jordan Langlois, a KCS train master, testified that on December 2, 2018, he was Harris's direct supervisor and received a call requesting him at Harris's location. He explained that it is KCS protocol to call a train master when there is an injury. Harris told him he hurt his back trying to release the handbrake. He asked Harris if he needed medical attention, and he said he did, so he and Allen helped Harris into the vehicle and Langlois drove him to the emergency room. Langlois stated that he did not investigate the accident for rule violations because his immediate concern was to obtain medical treatment for Harris. He saw Harris back at work a year or two after the accident and did not observe him having back problems.

Tobias Partington, a KCS train master, testified that he observed Harris operate the handbrake and did not take any exception to how he did it. He also worked with Harris after his injury and described him as slow and meticulous in his movements.

Donald Heiss testified he worked with Harris after his injury and noted that he was in pain, had difficulty walking, used ice packs and wore a back brace. He explained that Harris did his best to be a hard worker.

2

John David Engle, Jr. was accepted as an expert in railroad mechanical safety and brake systems. He explained the handbrake system and industry standards. He stated that the FSAA requires every freight car operating in the United States to be equipped with at least one efficient handbrake and explained that a handbrake with a quick-release lever that does not work is not an efficient handbrake. He did not see anything that indicated Harris violated any rule on December 2, 2018. He testified that the nonworking, quick-release lever on the handbrake rendered the entire handbrake inefficient, defective and in need of repair.

Milan G. Mody, M.D., was accepted as an expert in orthopedic spine surgery. He reviewed Harris's records from the emergency room on December 2, 2018, which reported pain in his lower back going down his right leg. He testified that his clinic has seen Harris 26 times since December 10, 2018. During his first visit, Harris complained of back pain and pain radiating into the right leg. Dr. Mody recommended physical therapy, anti-inflammatories and a lumbar MRI. The results of the MRI showed a right-sided disc protrusion, i.e., a disc herniation, at the L5-S1 and a disc bulge at the L4-L5. Dr. Mody's plan for Harris was physical therapy and a referral to a pain management physician for epidural injections at the L4-L5 and L5-S1 levels. Because Harris's leg and buttocks pain affected his ambulation, Dr. Mody performed decompression surgery on Harris on August 9, 2019. He stated that the surgery went well, with no complications, and that Harris had relief from his radiating leg pain. He noted that this surgery does not improve back pain, so Harris continued with physical therapy to strengthen his back. Dr. Mody testified that Harris returned to work at KCS from September 2020 to August 2021. The

3

heavy-duty type of work caused Harris's leg pain to return, so Dr. Mody took Harris off that type of work. He then recommended medial branch blocks and radiofrequency ablations ("RFAs"), which Harris had between January and March 2022. Dr. Mody related all of Harris's symptoms, all treatment thus far and all future recommended treatment to the December 2, 2018 accident. He consulted with Jeff Peterson, a vocational rehabilitation counselor, about future life care planning and future medical expenses for Harris and stated that he agreed with Peterson's report of recommendations. He noted that Harris will continue to need physical therapy, medication, MRI imaging and RFAs and will likely need a fusion surgery and an adjacent segment degeneration surgery in the future. He stated that Harris is permanently limited to light-duty work, which means never lifting over 20 pounds; no bending at the back, twisting, stooping, squatting or kneeling; and accommodations to be able to sit and stand. He stated that regular work attendance is difficult for patients with Harris's condition. Dr. Mody testified that he reviewed Harris's medical history, which includes things muscular in nature but nothing like the radicular problems and herniated discs now at issue. It showed that he had not had complaints of back pain for two years prior to the accident and those pains were caused by heavy exercise. On cross-examination, Dr. Mody further discussed Harris's medical records. He noted Harris fell through a bridge in 2011, which caused cervical and lumbar strain; was in a motorcycle accident in 2013; and had an accident in 2015 for which he reported three days of back pain. He agreed that he could not rule out a prior injury causing Harris's ossification or calcification. He stated that he did not perform a functional capacity

4

exam on Harris but used his experience of caring for injured workers to place him on the light-duty restriction.

Jeff Peterson was accepted as an expert vocational rehabilitation counselor and certified life care planner. He determined that Harris could not return to working for the railroad because of the severity of his injuries. He discussed his assessment of Harris to determine his vocational opportunities. He considered Harris's physical limitation of light duty and his needs for walking on flat surfaces to minimize falls and for a flexible work schedule. He felt that Harris's best option was to continue working in his wife's medical transport business as a driver for up to 20 or 25 hours per week. He analyzed Harris's earning capacity prior to the injury and noted that his KCS annual salary from 2014 to 2018 ranged from $59,860 to $83,000, with an average of approximately $70,000. He calculated that a part-time driver could earn between $9.21 and $9.77 per hour at first and with more experience can earn up to $12 or $13 per hour. Peterson met with Dr. Mody to formulate a future-care plan for Harris, with Dr. Mody recommending the medical care and Peterson determining the costs. He detailed the individual costs of services Dr. Mody wants to provide over the next 10 years and stated that $114,902.90 was needed for routine treatment costs, including doctor's visits, diagnostics, medications and physical therapy; $202,220 for a two-level fusion surgery; $161,415.67 for associated surgical costs; $1,540 for pre-operative care; $164,594 for post-operative care; and $210 for other equipment, which totals $644,882.52. He noted that Dr. Mody determined that Harris would likely need another surgery in 15 or more years, which would cost $169,049.07 for all surgical, pre-operative and

post-operative costs. He explained that the $644,882.52 and $169,049.07 totals represented the raw costs for Harris's future medical treatment.

John Theriot was accepted as an expert in economics and forensic accounting. He calculated Harris's past lost wages, future loss of earning capacity, fringe benefits and the present value of the life care costs. To calculate past lost wages, he determined that Harris had an average salary of $70,443 for the four years he worked as a conductor and then multiplied that number by 3.9, i.e., the number of years from the date of the injury to the trial date. He then reduced that number by the amount Harris earned when he temporarily returned to work at KCS after the injury and by a 15 percent tax rate. Those calculations determined Harris's past lost wages to be $176,387. For future loss of earning capacity, he determined Harris's work-life expectancy to be 19.92 years from the date of trial. He then calculated that if Harris earned an average $10.50 per hour for 40 years each week driving, he would earn $21,840 per year. He subtracted this number from his pre-injury average salary of $70,443 to determine that Harris had an annual loss of $48,603 per year. After considering inflation and taxes, he determined the total future loss to be $817,142. He also considered if Harris worked 20 hours per week as a driver, and after applying the same calculations, he determined the loss of earning capacity to be $1,000,737. Theriot also stated that fringe benefits for railroad workers are 29 percent of the wages. As to a 40-hour workweek, he calculated $282,635 loss of future fringe benefits, and as to a 20-hour workweek, he calculated losses of $346,137. Theriot also reviewed the future medical treatment numbers from Jeff Peterson's report and explained how he applied a discounting mechanism to these numbers. For the current 10-year treatment plan, he

calculated the present value to be $767,574. For the additional surgery that will likely be needed after that, he calculated the present value to be $202,258. He calculated the total present value of Harris's future medical treatment to be $969,832. On cross-examination, Theriot reviewed Harris's yearly salaries at KCS from 2014 to 2018 and noted that they decreased over time from $82,938 in 2014 to $59,860 in 2018. He explained that Harris did not work for most of December 2018 due to the injury, so his annualized salary for 2018 would have been $65,266.

LaKeesha Harris testified that she and Harris met in 2013 and married in 2016 and that each brought a daughter to the marriage. She never knew him to have severe back problems before December 2, 2018. She testified that since the injury, Harris is depressed because he cannot do the hobbies he used to do like riding motorcycles, playing basketball and lifting weights. She noted that he does not communicate, is stressed, has gained weight, sleeps in a reclining chair and no longer does his lawn service business. She stated that the injury affected their relationship because they are not able to be as intimate as they used to be because of his pain. She noted that he is still a good husband and father but agreed with counsel that he did not "have the swagger" he had before. She stated that they had to move to an apartment because they could no longer afford the house they were leasing to own. She testified that she began a medical transport business in May 2018 and explained that its drivers take Medicaid members to doctor appointments. She stated that Harris began driving for the business in October 2021 after he obtained his chauffeur's license and that he usually drives three or four times a week. She agreed that Harris has improved since an RFA in March 2022 and has been able to drive more. She stated that

7

Harris does not like driving and that he preferred being a conductor. She admitted that the week before trial she discovered that her taxes were never filed and explained that a family friend prepares her taxes. On cross-examination, KCS's attorney confronted her with inconsistencies in her deposition regarding the transportation business and Harris's involvement in it. KCS's attorney reminded her that in her April 2022 deposition, she said that Harris drove maybe once a week but that the logs show there were weeks he drove four times. She responded that she testified that he drove three or four times a week and did not remember what she said during her deposition. She testified that her business receives 1099s from the brokers who provide the members who need transportation. These forms showed that the business brought in approximately $24,000 in 2018, $73,000 in 2019 and $99,945 in 2020. She stated that she is looking into hiring a CPA to determine if she needs to resubmit her taxes.

Walter Harris testified that he and his wife have two daughters and that he takes pride in being a father. He stated that before he worked for KCS, he worked for CenterPoint Energy for eight years. He then attended a two-month training program so he could work for KCS. He was hired as a conductor, which includes being a brakeman, switchman and foreman. He stated that he also had a lawn service business to pay for his motorcycle hobby, but he no longer rides because he cannot enjoy it. He noted that before the injury he could bench up to 405 pounds and regularly worked out but after has gained weight. Harris testified about the day of the accident. He explained that Allen was the foreman and he was the switchman, and Allen stayed on the engine while he was on the first car. He climbed onto the car, kept a three-point contact stance and went to hit the quick release,

8

but it did not work. He hit the release several times and it did not work. He then felt a pop. He pulled on the wheel and the pain radiated down. He could not put any pressure on his leg, so Allen and Langlois helped him to Langlois's vehicle to go to the hospital. Harris testified about his treatment history. He stated that he did a lot of physical therapy, had injections in his back three or four times and then had nerve decompression surgery. He stated that RFAs have given him mobility in his legs. He noted that he still has back pain, but he can move much better. After surgery, he went back to work at KCS in September 2020. He noted that it was difficult because he had to walk long distances on rocks and over knuckles in the yard and could not lift and install knuckles. He stated that coworkers helped him and he wore a back brace and used ice packs because he wanted to give it his all. He quit working at KCS in August 2021 after his right leg was completely numb for several days, and Dr. Mody recommended that he not return to that type of work. He stated that since leaving KCS, he has filled out approximately 60 applications for a new job. He explained that because of his back injury and lifting restrictions, he does not meet hiring criteria. He stated that in September 2021, he obtained his chauffeur's license and began driving for his wife's company in October 2021. He admitted that it hurts to drive long distances, but he needs to provide for his family. He stated that since the injury, he can no longer ride rollercoasters, play basketball, ride motorcycles, run, do martial arts or play with the kids on the trampoline. He states that he dislikes living in an apartment. He discussed how the injury has negatively affected his romantic relationship with his wife. He discussed the pain medications he takes and explained that he does not want to take narcotics, but he does take anti-inflammatories. He continues to use

9

ice packs and to wear a back brace due to his back pain. He explained that physical therapy, which included massage therapy, helped him progress but did not improve his pain. He testified that KCS never said that he did anything wrong but did notify him that because of the restrictions set by Dr. Mody he can no longer be a conductor. He was aware that Dr. Mody testified that he would need surgery in the future but was unsure as to when. On cross-examination, he agreed that he was still classified as an employee of KCS, retains his seniority and is a member of a conductor's union. He stated that he had not looked for or applied for any other jobs with KCS.

Harris rested. KCS presented its witnesses. Keith Shea, superintendent of KCS's Shreveport terminal, testified about rules and regulations regarding operation of handbrakes, body positioning and reporting defective equipment. He discussed KCS's operations and types of jobs, noting that there are some sedentary jobs.[1] On cross-examination, he agreed that KCS did not cite Harris with any violations and explained that their immediate concern was getting him medical attention. He stated that Harris should have stopped working and reported the problem when the quick release lever did not engage. He noted that if he had known that at the time, he would have held Harris accountable.

Aaron Wolfson, Ph.D., was accepted as an expert vocational rehabilitation counselor and life care planner. He reviewed the life care plan and vocational opinion offered by Jeff Peterson. He did not complete a full assessment of Harris but relied on the assessment performed by Peterson as

---

[1] KCS proffered a portion of Shea's testimony. He stated that in October 2022, two positions became open at the Shreveport terminal—yard master and train master. He noted that there are no physical duties for a yard master and that it is sedentary. He believed that Harris had the experience to perform this job.

10

to Harris's abilities and restrictions in the work field, deposition testimony and Harris's medical records. He noted that there were a few areas where he found different costs than those presented by Peterson. He provided an example that Peterson presented the cost of an MRI to be $11,135.14, but Wolfson found lower prices that ranged from $1,600 to $4,200. He also would have removed $10,000 for massage therapy because it had not been prescribed by Dr. Mody and $130,000 for lifetime routine physical therapy because there was not a medical foundation for it. After his calculations, Wolfson determined that the medical costs should be $635,507. Regarding the vocational evaluation, he accepted the work restrictions identified by Peterson and looked for jobs that met those restrictions, including those with KCS. He found jobs that indicated a higher median wage than the driver position used in Peterson's report. He also opined that Harris could earn at least $30,620 annually as a driver. On cross-examination, he noted that he has no reason to doubt Dr. Mody's recommendations and is not refuting them.

Joseph B. Bamburg, the manager of KCS's locomotive shop, testified about operations at the Shreveport terminal, including inspections and repairs. He was involved in the inspection of the railcar involved in the accident. Because an injury was reported on that car, he placed it in bad-order status so the handbrake could be removed and replaced.

Foster Peterson was accepted as an expert in railroad operations, particularly railroad and car equipment, including air brakes and handbrakes. He detailed the operation of a handbrake and relevant regulations. The jury viewed a video of him operating the handbrake at issue. He opined that the handbrake was efficient at the time of the accident and complied with

11

regulations. He noted that a quick release is not required under the FSAA. He evaluated information about Harris's operation of the handbrake, noting that he pulled hard and twisted, and determined that Harris was not in compliance with KCS's rules on body mechanics, which state to use moderate force when pulling and to avoid turning or twisting the body while lifting and holding a heavy object.

On November 4, 2022, the jury returned its verdict. It found that KCS was not negligent under the FELA but that the handbrake violated the FSAA, which was a cause, in whole or in part, of injuries to Harris. It determined that Harris was negligent and that his negligence was a cause, in part, of his injuries. It attributed 50% negligence to KCS and 50% to Harris. It found that $180,000 for past lost wages and future earning capacity would adequately compensate Harris for his injuries. It did not award damages for future medical/life care expenses, past and future physical pain and suffering, past and future mental anguish, past and future loss of enjoyment of life or damages for permanent impairment of bodily function.

On November 17, 2022, the trial court filed a judgment. It stated the findings of the jury and rendered judgment in favor of Harris and against KCS in the amount of $180,000 in damages for past lost wages and future loss of earning capacity.

On December 5, 2022, Harris filed a motion for JNOV or, in the alternative, for new trial. He argued that the verdict conflicted with the law and evidence presented at trial regarding sufficiency of damages and liability. He contended that the jury erred in failing to award general damages and future medical expenses; failing to follow jury instructions;

12

and in inconsistently determining liability to find KCS not negligent under the FELA but attributing 50% negligence to it.

On January 30, 2023, KCS filed an opposition. It stated that there was a reasonable and substantial evidentiary basis for the jury's verdict and that it should be afforded great deference. It contended that it presented testimony and evidence through its witnesses and elicited testimony from Harris's witnesses that disputed his damages claims while raising significant credibility issues.

On February 2, 2023, Harris filed a reply to KCS's opposition. He argued that the jury believed he suffered a real and debilitating injury from the accident, as evidenced by its $180,000 award, but failed in its duty to evaluate general damages. He contended that there was no evidence to support the abusively low damages awarded in this case. He stated that no credibility issues cast doubt on the uncontroverted medical evidence that he suffered a spinal injury in the accident.

On March 9, 2023, the trial court signed an order granting Harris's motion for JNOV. Based on the jury's award for past lost wages and future loss of earning capacity, the court inferred that it believed Harris's injuries were so substantial that he could not work. The court noted that although it found Dr. Mody to be credible, the jury did not accept his testimony concerning the cause and extent of Harris's injuries. It stated that the jury's findings were logically inconsistent because only an injury would explain Harris's inability to work in the past or future. It determined that an increase in damages was necessary to reflect the logical consequence of the jury's finding of fault. It increased the award for future medical and life care expenses and explained that although the jury awarded $0 in this category,

which suggested it did not believe KCS should be liable for the costs of Harris's surgeries and future medical treatment, its award of past and future lost earnings led the court to infer that the jury believed Harris suffered some injury that would require future medical care. It awarded $114,902.90 and explained this is the amount Jeff Peterson found that Harris will incur in routine treatment because of his injuries and which are costs not directly associated with or attributable to the future surgeries recommended by Dr. Mody. The trial court awarded an additional $75,000 and explained that in the absence of surgery, the nonsurgical costs can be expected to be greater because the surgical intervention will not be providing any relief. It also found that if Harris suffered injuries sufficient to prevent him from working, then he must have experienced some pain, discomfort and loss of enjoyment of life; and, therefore, the jury's choice to award no damages is inconsistent with their fault finding and award for wages. Accordingly, the trial court did not disturb the jury's finding of fault and entered judgment in favor of Harris and against KCS. It did not disturb the award of $180,000 for past lost wages and future loss of earning capacity. It modified the verdict in part to award $189,902.90 for past and future medical expenses and $30,000 for past and future physical pain and suffering. In total, it awarded $399,902.90 plus costs and legal interest to Harris.

Harris appeals the March 9, 2023 judgment.

## DISCUSSION

The FSAA does not create a federal cause of action for employees seeking damages for injuries resulting from a railroad's violation of the Act. *Crane v. Cedar Rapids & I. C. Ry. Co.*, 395 U.S. 164, 166, 89 S. Ct. 1706, 1708, 23 L. Ed. 2d 176 (1969). Congress provides a cause of action in the

14

FELA, which embraces claims of an employee based on violations of the FSAA. *Id.* In such actions, the employee is only required to prove that his injury resulted, in whole or in part, from the railroad's violation of the FSAA, and the railroad is deprived of the defenses of contributory negligence and assumption of risk. *Id.* In short, the FSAA provides the basis for the claim, and the FELA provides the remedy. *Cordes v. New Orleans Pub. Belt R.R. Corp.*, No. CV 21-432, 2022 WL 539274 (E.D. La. Feb. 23, 2022), *quoting Beissel v. Pittsburgh & Lake Erie R. Co.*, 801 F. 2d 143 (3d Cir. 1986).

State courts are required to apply federal substantive law in adjudicating FELA claims. *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 108 S. Ct. 1837, 100 L. Ed. 2d 349 (1988); *Broussard v. Union Pac. R. Co.*, 29,769 (La. App. 2 Cir. 8/28/97), 700 So. 2d 542, *writ denied*, 97-2414 (La. 12/12/97), 704 So. 2d 1202. However, state rules of procedure apply in state court. *E'Teif v. Nat'l R.R. Passenger Corp.*, 98-2503 (La. App. 4 Cir. 4/22/99), 733 So. 2d 155, *writ denied*, 99-1500 (La. 9/3/99), 747 So. 2d 548, *citing St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 105 S. Ct. 1347, 84 L. Ed. 2d 303 (1985).

We note that on appeal, neither party contests the issue of liability. Rather, Harris raises three assignments of error arguing that the trial court erred in not sufficiently increasing his damages awards. Before we make this determination, we must first address the preliminary issue of whether the trial court erred in granting the JNOV.

*Judgment Notwithstanding the Verdict*

La. C.C.P. art. 1811 provides for the use of a JNOV. A motion for JNOV may be granted on the issue of liability or on the issue of damages or

15

on both issues. La. C.C.P. art. 1811(F). La. C.C.P. art. 1811 does not specify the grounds on which a trial court may grant a JNOV. Louisiana jurisprudence has set forth the criteria used to determine when a JNOV is proper. In *Joseph v. Broussard Rice Mill, Inc.*, 00-0628 (La. 10/30/00), 772 So. 2d 94, the Louisiana Supreme Court stated:

> [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. . . . In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

The court in *Joseph v. Broussard Rice Mill, Inc.*, *supra*, also discussed the standard of review on appeal and stated:

> In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

In this case, the trial court did not err in granting the JNOV on the issue of damages. It correctly determined that the jury's verdict was inconsistent in that it found that KCS was liable under the FSAA and awarded $180,000 for past lost wages and future earning capacity, which suggested Harris had suffered some injury, but failed to award any damages

16

for medical expenses. Considering the necessity of an award of medical expenses to create a consistent verdict, the facts and inferences point so strongly and overwhelmingly in favor of Harris that reasonable persons could not arrive at a contrary verdict.

We note that the trial court should not have made a credibility determination regarding Dr. Mody in his ruling. However, as discussed below, the trial court's selective modifications to the damages awards show careful deference to the jury's findings and apparent credibility determinations.

*Damages*

The proper measure of damages under the FELA is inseparably connected with the right of action. *E'Teif v. Nat'l R.R. Passenger Corp.*, *supra*. It is an issue of substance that must be settled according to the general principles of law as applied by the federal courts. *Id*. If the railroad's negligence played any part, no matter how small, in causing an employee's injury then the railroad is liable for the resulting damages. *Id*. Under the FELA, a successful plaintiff is entitled to recover for all past, present and probable future harm attributable to defendant's tortious conduct, including pain, suffering and mental anguish. *Williams v. City of New Orleans*, 04-0655 (La. App. 4 Cir. 1/19/05), 897 So. 2d 744, *writ denied*, 05-0416 (La. 4/22/05), 899 So. 2d 580.

The appellate courts of this state have afforded great weight to jury verdicts in FELA cases. *E'Teif v. Nat'l R.R. Passenger Corp.*, *supra*. An appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of any probative facts to support the fact finder's conclusions. *Richardson v. Kansas City S. Ry. Co.*, 31,735 (La. App. 2 Cir.

17

4/1/99), 731 So. 2d 1017, *writ denied,* 99-1267 (La. 6/18/99), 745 So. 2d 607.

*Future Medical Expenses*

In his first assignment of error, Harris argues that the trial court erred in awarding an unsupported low award for future medical expenses despite the uncontradicted evidence at trial by his treating physician and the fact that every expert causally related his necessary future medical treatment. He contends that the trial court erred by modifying the award to the amount of only nonsurgical future medical expenses because there was no evidence to limit medical expenses this way. He states that the only medical testimony offered at trial was from Dr. Mody and that KCS did not offer an expert to refute his testimony. He contends that the only contested evidence at trial was the difference between Jeff Peterson's calculation of $969,832 in future medical expenses and Aaron Wolfson's calculation of $635,507.69. Therefore, he argues that the $189,902.90 awarded by the trial court is unsupported by the evidence and should be increased to $969,832, or at least to $635,507.69.

KCS argues that the future medical award is not manifestly erroneous because it is supported by the record. It contends that the jury did not believe Harris's experts' testimony on the cause and extent of his claimed injury. It states that Dr. Mody provided contradictory evidence regarding Harris's need for any future surgery. It contends that Jeff Peterson's life care plan was simply wrong, riddled with inaccuracies and overpriced.

Medical expenses are a recoverable element of damages under the FELA. *E'Teif v. Nat'l R.R. Passenger Corp.*, *supra*.

18

At trial, Harris presented evidence through his testimony and the testimonies of Dr. Mody, Jeff Peterson and John Theriot that he will incur medical expenses of $969,832 as a result of the injury that occurred while operating the defective handbrake. According to the trial court's ruling on the JNOV and as can be inferred from the jury's verdict, the jury clearly did not accept this evidence as credible. KCS successfully challenged the credibility of these witnesses through presenting evidence of Harris's preexisting injuries and, through Aaron Wolfson's testimony, of lower costs of medical treatment.

When granting the JNOV, the trial court awarded $114,902.90 and explained this is the amount Jeff Peterson found that Harris will incur in routine treatment costs, which includes doctor visits, diagnostics, medications and physical therapy. It noted that this amount does not include costs associated with future surgeries recommended by Dr. Mody and, therefore, awarded $75,000 to account for an increase in nonsurgical costs in the absence of future surgeries.

When awarding medical expenses, the trial court balanced deferring to the findings of the jury, which did not award any medical expenses, with creating consistency in its verdict. The award of $189,902.90 for future medical expenses is supported by the evidence presented at trial. There is not a complete absence of any probative facts that necessitates a reversal of the trial court's award.

Accordingly, this assignment of error lacks merit.

*Future Loss of Earning Capacity*

In his second assignment of error, Harris argues that the trial court erred in failing to increase the award for his future loss of earning capacity

19

despite the undisputed expert testimony of his accident-related physical limitations. He contends that Jeff Peterson and Aaron Wolfson agreed that Harris had physical limitations to vocational opportunities. He notes that John Theriot testified that he suffered $176,387 in past lost wages and that he will suffer approximately $1,000,737 in future loss of earning capacity. Harris notes that the jury's award of $180,000 covers his prior wage loss and argues that his award for future loss of earning capacity should be increased to $1,000,737, the amount supported at trial.

KCS argues that the economic loss award was not manifestly erroneous because it approximated his past wage loss, Harris's witnesses were not credible, he failed to mitigate his damages and he worked extensively in the family business. It contends that a jury could easily find that Harris's last-minute efforts to look for work were solely for optics and to further his allegation that his work injury incapacitated him from performing any railroad work or work with a similar salary. It argues that given Harris's extensive work in the family business, Dr. Mody's work restrictions raised credibility issues, which supported the jury and trial court's limitation on Harris's economic claims.

In a FELA case, a jury can award any amount for loss of future earning capacity so long as probative facts support their finding. *E'Teif v. Nat'l R.R. Passenger Corp.*, *supra*.

At trial, Harris presented his testimony as well as the testimonies of his wife, Dr. Mody, Jeff Peterson and John Theriot to demonstrate his past lost wages and future loss of earning capacity. Dr. Mody limited Harris to light-duty work, and Peterson analyzed Harris's vocational opportunities. Theriot provided calculations of past lost wages and future loss of earning

20

capacity. Harris and his wife both testified about Harris's current employment in her medical transport business, and Harris discussed his efforts to apply for a new job. The jury's award of $180,000 for past lost wages and future loss of earning capacity suggests that they accepted Theriot's calculations of past lost wages, which totaled $176,387. The jury's decision not to award damages for his future loss of earning capacity suggests that it considered his current employment in the medical transport business, that KCS successfully challenged the credibility of Harris's witnesses through cross-examination and that the jury accepted the testimonies of Keith Shea and Aaron Wolfson regarding available employment for Harris. It appears that the jury did not find Harris or his wife to be credible and thought there were opportunities for him to earn a living, including at KCS.

The trial court did not disagree with the jury and chose not to modify this award through the JNOV. There is not a complete absence of any probative facts that necessitates a reversal of the trial court's decision not to increase the award for future loss of earning capacity.

Accordingly, this assignment of error lacks merit.

*General Damages*

In his third assignment of error, Harris argues that the trial court erred in awarding an abusively low award for general damages when the uncontradicted expert testimony was that he suffered a spinal injury. He contends that the facts and inferences overwhelmingly support an award for past and future physical pain and suffering, for past and future mental anguish, for loss of enjoyment of life and for permanent loss of bodily function. According to his quantum analysis, he submits that $500,000 is

21

the lowest reasonable award for his past and future pain and suffering, $250,000 for mental anguish, $200,000 for loss of enjoyment of life and $50,000 for permanent loss of bodily function.

KCS argues that the trial court's modest modification of the general damages award recognized the jury's great discretion and represented the highest possible award based on the evidence. It states that Harris did not present evidence of mental damages, so the non-award of such damages is not manifestly erroneous.

The correct standard to be applied in FELA cases to determine whether a general damages award is supported by the evidence is the same as that applied in other Louisiana cases. *Thornton v. Nat'l R.R. Passenger Corp.*, 00-2604 (La. App. 4 Cir. 11/14/01), 802 So. 2d 816, *writ denied*, 01-3282 (La. 3/15/02), 811 So. 2d 907. In its initial inquiry, the court on appeal determines whether the trier of fact abused its discretion in assessing the amount of general damages. *Pete v. Boland Marine & Mfg. Co., LLC*, 23-00170 (La. 10/20/23), 379 So. 3d 636, *reh'g denied*, 23-00170 (La. 12/7/23), 374 So. 3d 135. To evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. *Id*. If an abuse of discretion is found, the court is to then also consider those prior awards to determine the highest or lowest point that is reasonably within that discretion. *Id*. A review of prior awards is not the only factor to be considered in evaluating whether a general damage award is an abuse of discretion; it is a starting point. *Id*. No two cases will be identical. *Id*. The review of prior awards will simply serve to illustrate and supply guidance in

22

the determination of damages. *Id.* Other factors are to be considered as well. *Id.*

We first consider the particular facts and circumstances of the case under review. At trial, Harris and his wife testified about his past and future physical pain and suffering, past and future mental anguish, loss of enjoyment of life and loss of bodily function. They both detailed Harris's continued pain and that he in unable to enjoy his hobbies. Through cross-examination of Dr. Mody, KCS also elicited testimony of Harris's previous injuries, and Dr. Mody could not rule out that a prior injury caused Harris's ossification or calcification. The jury's decision not to award any general damages suggests that it did not find Harris and his wife to be credible witnesses. When granting the JNOV and awarding general damages, the trial court reasoned that if Harris suffered injuries that prevented him from working, he must have experienced pain and loss of enjoyment of life.

In his brief, Harris supported his argument with cases in which the trial court awarded the plaintiff significant general damages. *See Raynes v. McMoRan Expl. Co.*, No. CIV.A. 08-5018, 2012 WL 1032902 (E.D. La. Mar. 27, 2012), *aff'd,* 508 F. App'x 285 (5th Cir. 2013) (plaintiff was injured on an oil production platform; he underwent two surgeries to repair a ruptured disc; the jury awarded $2,000,000 in general damages); *Johnson v. Neill Corp.*, 15-0430 (La. App. 1 Cir. 12/23/15),[2] *writ denied*, 16-0137 (La. 3/14/16), 189 So. 3d 1068, and *writ denied*, 16-0147 (La. 3/14/16), 189 So. 3d 1070 (plaintiff suffered a ruptured disc during a massage; she underwent a discectomy; the trial court awarded $250,000 for pain and

---

[2] This is an unpublished opinion.

suffering, $250,000 for loss of enjoyment of life, $200,000 for permanent disability, $27,550 for past lost wages; and $107,811 for past medical expenses; the court of appeal affirmed); *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245 (plaintiff suffered serious injuries in an automobile collision, including a herniated disc; plaintiff's pain improved after two cervical surgeries; a surgeon recommended two additional surgeries; the trial court awarded damages of $300,000 for general damages for cervical injuries, $100,000 for general damages for lumbar injuries, $169,353.20 for past medical expenses, $61,347.20 for future medical expenses, $85,000 for past lost wages and $345,000 for future lost wages; the appellate court affirmed); *Daigle v. City of Shreveport*, 46,429 (La. App. 2 Cir. 10/5/11), 78 So. 3d 753, *writ denied*, 11-2472 (La. 2/3/12), 79 So. 3d 1027 (plaintiff had a history of neck and back pain; after a fall, she was in constant pain, which a nerve block procedure did not alleviate; a surgeon recommended that she undergo spinal surgery; the trial court awarded damages: $10,815.70 for past medical expenses, $452,686 for future medical expenses, $200,000 for loss of enjoyment of life and $400,000 for pain and suffering; the appellate court reduced this award to the $500,000 cap on general damages in cases against the state and its political subdivisions); and *Parquette v. Certified Coating of California, Inc.*, 06-1527 (La. App. 4 Cir. 8/22/07), 966 So. 2d 91 (plaintiff sustained mental and physical injuries in an automobile accident; she underwent a fusion surgery; the jury awarded her $800,000 for past and future physical pain and suffering, $100,000 for past and future mental pain and suffering, $80,000 for future medical expenses, $36,000 for lost wages, $100,000 for loss of enjoyment of life and $68,000 for medical expenses; the court of appeal affirmed).

This court considered additional cases with similar injuries and treatments. *See Tripp v. DG Louisiana, LLC*, 23-487 (La. App. 5 Cir. 4/24/24), __ So. 3d __, *reh'g denied* (May 7, 2024) (plaintiff injured her back and leg in a fall; she underwent two surgeries and was recommended a third surgery in the future; the jury awarded $200,000 for general damages, $36,000 for past loss of enjoyment of life and $378,655.23 for past medical expenses; appellate court affirmed); *Copell v. Arceneaux Ford, Inc.*, 20-299 (La. App. 3 Cir. 6/9/21), 322 So. 3d 886 (plaintiff injured his neck in an automobile accident; he underwent a cervical discectomy and fusion surgery and will likely need an additional surgery; the jury awarded $16,000 in general damages, $104,000 in past medical expenses and $95,000 in future medical expenses; the appellate court increased the award of future medical expenses to $217,393.06, increased the general damages award to $100,000 for past and future pain and suffering, awarded $25,000 for past and future mental anguish and awarded $25,000 for loss of enjoyment of life); *Simon v. Auto. Club Inter-Ins. Exch.*, 20-156 (La. App. 5 Cir. 10/13/21), 329 So. 3d 1072 (plaintiff injured her back and hip in an automobile accident; she underwent two back surgeries and one hip surgery; the jury awarded $188,928 for past medical expenses, $90,000 for future medical expenses and $35,000 in general damages for physical pain and suffering; the appellate court increased the general damages award to $200,000 to create a consistent award but declined to award lost wages or loss of earning capacity); *Case v. Shelter Ins. Co.*, 10-302 (La. App. 3 Cir. 10/6/10), 48 So. 3d 1196 (plaintiff injured her back in an automobile accident; she underwent a discectomy; the jury awarded $35,096.32 for past medical expenses, $3,000 for future medical expenses, $18,700 for past lost wages,

$93,500 for future loss of earning capacity and $49,998 in general damages; the court of appeal increased the general damages award to $100,000).

The cases discussed above represent a sampling of jurisprudence involving back injuries and subsequent surgeries. In this selection of cases, awards of general damages range from $100,000 to $2,000,000. A consideration of these cases demonstrates that the trial court abused its discretion in the case *sub judice* when it awarded unreasonably low general damages. Through a review of these prior awards, we determine that $100,000 is the lowest reasonable award for general damages.

Accordingly, this assignment of error has merit. We amend the award of general damages from $30,000 to $100,000.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's granting of Plaintiff-Appellant Walter Harris's motion for JNOV and its increase of damages in his favor. We amend the award for general damages from $30,000 to $100,000 and affirm this award as amended. Costs of this appeal are assessed equally to Plaintiff-Appellant Walter Harris and Defendant-Appellee Kansas City Southern Railway Company.

**AFFIRMED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.**